## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEM CITY MANAGEMENT INC., | Index No.: 21-cv-7676 |
| Plaintiff, | |
| -against- | **COMPLAINT** |
| | **Jury Trial Demanded** |
| JEFFREY RINDE, CKR LAW LLP, DONALD HIRSCH, MONSTER CAPITAL CORP., SAFARI TRADING LLC, and RICK SIEGEL, | |
| Defendants. | |

Plaintiff Gem City Management Inc. ("Gem City" or "Plaintiff"), for its Complaint against defendants Jeffrey Rinde ("Rinde"), CKR Law LLP ("CKR"), Donald Hirsch ("Hirsch"), Monster Capital Corp. ("Monster"), Safari Trading LLC ("Safari"), and Rick Siegel ("Siegel") (collectively, "Defendants"), alleges as follows:

### NATURE OF THE ACTION

1.     This action arises from a repeated and ongoing scheme perpetrated by Defendants against victims in a variety of states, whereby Defendants conspired to, and executed, a plan to defraud victims out of hundreds of thousands of dollars, with an aggregate loss to the victims of millions of dollars, through the requirement of advance fees to participate in a fraudulent loan scheme.

2.     Using a variety of complicated corporate entities that Defendants represented were legitimate, Defendants conspired to execute a plan to defraud Gem City, and inevitably other

victims, of hundreds of thousands of dollars based upon promises of a return of millions, through fraudulent loan programs requiring an advance fee.

3.     Defendants' highly-sophisticated scheme was in essence an advance fee scheme disguised to appear to be a legitimate investment and loan operation crafted by Defendants to reap enormous profits, all at the expense of Plaintiff who, at all times, entrusted Defendants to provide guidance and eventually legal advice.

4.     At its core, Defendants' scheme involved the following features, each meant to add credibility and legitimize the fraudulent scam:

    a.  Offering returns on investments that were disproportionate to the risk involved;

    b.  Mimicking legitimate financial instruments, with complicated and lengthy contractual agreements;

    c.  Asking for payment of an advanced fee prior to funding or initiating the loan or investment;

    d.  Allegedly transferring funds overseas and using foreign banks;

    e.  Improper referencing to legitimate financial institutions (likely without the financial institutions' knowledge or consent);

    f.  Intricate explanations and excuses as to why the promised funds failed to materialize; and

    g.  The use of escrow accounts, including attorney escrow accounts.

5.     In short, Defendants' scheme was to offer prospective loan recipients "loans" in million dollar amounts but required them to put hundreds of thousands of dollars in escrow to secure the loan, which, ultimately was never disbursed, and the escrow amount was never returned.

6.      Here, Gem City, as the prospective loan recipient, was offered $12 million in loans from Monster, but was required to deposit $480,000 in escrow with Rinde and CKR to "secure" the loan.

7.      The loan was never disbursed, and the escrow deposit was never returned.

8.      As a result of the Defendants' actions, Gem City has been harmed financially and seeks to recover damages to make it whole again.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §§ 1962 and 1964.

10.      Supplemental jurisdiction over the common law and State law claims alleged herein is available under 28 U.S.C. §1367(a) as they arise from the same core of operative facts as those arising under 18 U.S.C. §§ 1962 and 1964 and are therefore properly brought before the Court.

11.      Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Defendants, in particular Rinde and CKR, reside, are found, have agents, and transact their affairs as alleged herein within this district, and a substantial part of the events or omissions giving rise to the action occurred within this district.

## PARTIES

12.      Gem City is an Ohio corporation with its principal place of business in Dayton, Ohio.  Gem City is involved in the cultivation of legal marijuana in Ohio.  All of Gem City's shareholders reside in Ohio.

13.      CKR is a limited liability partnership formed under the laws of California, with its principal place of business at 1330 Avenue of the Americas, 12th & 14th Floors, New York, New

York 10019. CKR promotes itself as a global law firm operating through various separate and distinct legal entities.

14.     Rinde is a resident of the State of Connecticut. Rinde is, and at all relevant times was, an attorney licensed to practice in the State of New York under registration number 2502839. Rinde is a named partner, co-founder, and at all times relevant to this action, the Managing Partner of CKR. In addition, the services Rinde provided for Gem City, as Escrow Agent, happened in or around New York County, New York.

15.     Hirsch is a resident of the State of Illinois. Hirsch is, and at all relevant times was, the owner, manager, and/or principal of Monster, a Limited Liability Company with its principal place of business in Hoffman Estates, Illinois. Monster purportedly specializes in providing financing solutions for projects requiring at least $10 million, and appear to be rebrands of each other.  Monster has business address of 146 W. Higgins Rd., Hoffman Estates, IL 60169 – an empty storefront in a strip mall.

16.     Siegel is a resident of the State of Florida. Siegel is affiliated with Rinde, CKR, and Hirsch, assisted them in promoting the loan programs under the various corporate entities, and partook in the ill-gotten proceeds.  Siegel is the owner of Safari.

17.     Although the precise structure, parties, and the flow of money is still partially unknown, it is clear that Hirsch, Monster, Rinde, CKR, Siegel, and Safari represented to Gem City that they had negotiated a secured term loan for $12 million, and that Gem City would begin to receive funds after depositing $480,000 in an escrow account.

## FACTUAL ALLEGATIONS

18.     In late 2020, Gem City was seeking financing in order to develop a legal marijuana cultivation facility, and for other corporate uses.

4

19.     The cannabis industry is an emerging industry rife with complex regulatory and legal issues; traditional lenders, such as banks, do not typically provide financing for such operations.

20.     In September or October 2019 Gem City had a call with Hirsch, who pitched a loan program for Plaintiff.

21.     In October 2019, Hirsch provided an initial proposal to provide approximately $12 million in financing to Gem City.

22.     In subsequent phone calls, Hirsch assured Plaintiff that he had successfully closed numerous other loans similar to the loan being negotiated with Plaintiff.

23.     On November 14, 2019, the parties executed a Memorandum of Understanding ("MOU") with respect to the proposed financing.  The MOU provided that, upon completion of certain conditions precedent, Gem City would receive its initial advance of $1.2 million and a total loan in the amount of $12 million.

24.     The financing and loan transaction purportedly closed on December 19, 2019, and was memorialized in the Term Loan Agreement, Note, Pledge, and Security Agreement, all dated December 19, 2019.

25.     Rinde and CKR agreed to act as Escrow Agent for this transaction in an Escrow Agreement, dated November 12, 2019.

26.     CKR, as Escrow Agent, agreed to hold and to release Gem City's deposit of $480,000 subject to the terms and agreements of the Escrow Agreement.

27.     The Escrow Agreement provided that the escrowed funds were to be placed in the CKR attorney trust account, and further required that the funds be returned to Gem City upon the

same conditions as set forth in in the letter agreements from Monster and Safari. Upon repeated

inquiry, Rinde represented to Plaintiff that the escrowed funds were "secure."

28.     More specifically, in relevant part, the Escrow Agreement provides in paragraph 4

that:

    a.  The Escrow Agent shall release the Escrow Payment to the BI provider pursuant to
its instructions within two (2) international banking days of receipt by the Escrow
Agent of:

        i.  a copy of the SWIFT MT760 with "Answer Back" from M-Corp's designated
bank, confirming the issuance and successful transmission of the BI; and

        ii.  a copy of M-Corp's commitment from a third party to monetize the BI and
fund the Loan, which agreement provides committed funding sufficient to pay
the first disbursement and subsequent disbursements up to the Loan Amount
[of $12 million] over a ten-month period; and

    b.  Upon notice from [Gem City] that M-Corp has failed to deliver the BI by SWIFT
MT760 to M-Corp's designated bank within two (2) international banking days of
payment of the Escrow Payment, the Escrow Agent shall, if not previously released,
return the Escrow Payment to [Gem City] within two (2) international banking day
of receipt of such notice. An "international banking day" means a day on which banks
in New York and London are open for business.

            ***

    h.  Notwithstanding anything to the contrary in this Agreement, if M-Corp cannot get a
commitment from a third party to monetize the BI and fund the Loan Escrow, then
the Escrow Agent shall return any Escrow Payments received from the Escrow
Parties to the respective party within two (2) international banking days of notice of
the failure to monetize the BI and fund the Loan Escrow.

29.     The requirements set forth in the Escrow Agreement did not occur, but somehow,

it seems that Rinde still released Gem City's funds from CKR's escrow account.

30.     In a letter dated December 19, 2019 Monster agreed that if Gem City did not receive

the promised $1.2 million within 100 days of its deposit of the escrow, Monster would cause the

$480,000 to be returned to Gem City. This same obligation was confirmed in a November 25, 2019

letter from Safari, which was confirmed by Rinde and CKR, as Escrow Agent.

31.     The only condition precedent required by Gem City for it to receive the first $1.2 million payment, was for it to place $480,000 in escrow with Rinde and CKR, which it did in December 2019.

32.     After 100 days, the promised funds were not provided, and Plaintiff requested the return of its $480,000 in accordance with its rights under the above agreements.

33.     Among other things, Defendants claimed that the funding was held up by the Covid-19 pandemic, that the "Feds" had seized the funds, and that the funds were "held up" in London, all of which were false and known to have been false when made.

34.     Rinde, on behalf of CKR, claimed that the escrowed funds were transferred to the other defendants, without regard to the fact that any such transfer would have been in contravention of the terms of the Escrow Agreement.

35.     On other occasions, Rinde claimed that the funds were held up due the actions of certain unnamed persons "in the middle east."

36.     And, on other occasions, Rinde claimed that he was unavailable to release the funds because he was "stuck in China" or "stuck in Cambodia" due to the Covid-19 pandemic.

37.     Even if his representations of his physical location were true (they were not), they still would not have prevented him for honoring his legal duties owed to Gem City as Escrow Agent.

38.     In fact, it appears that the account number used by Rinde and CKR to receive the escrow funds was CKR's operating/checking account, not its trust account.

39.     Notwithstanding, the $480,000 deposit was never returned to Gem City.

**Culpable Persons**

40.     Each of the named Defendants are people or entities capable of holding a legal or beneficial interest in property.

**Enterprise**

41.     The named Defendants constitute an established enterprise-in-fact; the purpose of such enterprise being solely to unlawfully deprive prospective loan clients of significant sums of money, to the benefit of defendants.

**Interstate/Foreign Commerce**

42.     The escrow fund wire from Plaintiff, took place from Ohio, and were sent to a New York account. Telephone calls and mailings in furtherance of the scheme have been made to and from Ohio, Illinois, Florida and New York. Rinde also claimed to have wired Gem City's escrow funds overseas.

**Pattern of Racketeering Activity**

43.     The  Defendants have engaged in at least two acts of racketeering activity which occurred within the last ten (10) years; acts that have the same or similar purposes, results, participants, victims, methods of commission, or otherwise interrelated by distinguishing characteristics and are not isolated events.

44.     The scheme consists of related predicate acts, extending over a substantial period of time, upon information and belief since at least 2014 to the present.

45.     Further, given that the last presently-known victims were defrauded in 2019 and the Defendants are upon information and belief continuing to advertise the loan program, there is a threat of continuing criminal conduct.

## Predicate Acts

46.      A series of similar acts by Defendants are set forth in cases 20-cv-2898, 21-cv-1565, and 21-cv-2321 in the Southern District of New York. For purposes of brevity those allegations are incorporated herein by reference.

### *Arizona: Steve O'Neill*

47.      On June 24, 2015, David Ault ("Ault"), Straightline LLC ("Straightline"), Rinde, and CKR entered into a substantially similar agreement to the instant matter with non-party L3gacy Growth Fund, LLC ("L3gacy").

48.      L3gacy sought a $9 million USD loan. Rinde, Ault, Siegel, and Hirsch required $350,000 to be placed in escrow to secure the loan. Ault and Straightline provided assurances regarding their ability to secure the loan, and Rinde and CKR provided assurances that the escrow would be held until the loan funds were secure.

49.      The $350,000 escrow was provided by non-party Steve O'Neill. The funds were wired on July 2, 2015, from Arizona to CKR's account at Citibank in New York.

50.      The loan funds were never secured or disbursed; however, Rinde and CKR released the Escrow.

51.      On May 4, 2017, Steve O'Neill secured a judgment directing the return of the Escrow funds.

52.      To date, the Escrow funds have not been returned to Mr. O'Neill. The matter is ongoing in the Superior Court of the State of Arizona, County of Maricopa, under Case No.: CV2016-016821.

### *Florida: Luxury International Brands, Inc.*

53.     Luxury International Brands, Inc. ("Luxury Int'l") sought financing through the Defendants in or around June 2018. Luxury Int'l sought $20 million USD in loans and was required to put $150,000 in escrow to secure the loan. The loan was never disbursed, and the escrow has not been returned.

54.     This transaction is currently the subject of a lawsuit pending in the Circuit Court of the 17th Judicial Circuit, in and for Broward County, Florida: CACE 21-010462.

### *Illinois: Tony Ciccarelli*

55.     Upon information and belief, Tony Ciccarelli sought financing through the Defendants in or around March 2019. Ciccarelli sought $10 million USD in loans and was required to put $400,000 in escrow to secure the loan. The loan was never disbursed, and the escrow has not been returned.

### *Illinois: Rick Silverstein*

56.     Upon information and belief, Rick Silverstein sought financing through the Defendants in or around October 2019. Silverstein sought $10 million USD in loans and was required to put $400,000 in escrow to secure the loan. The loan was never disbursed, and the escrow has not been returned.

### *Illinois: Joseph Ori*

57.     Upon information and belief, in or around June 2019, Joseph Ori sought financing through the Defendants. Unlike the other predicate acts, wherein loan seekers sought financing primarily through Hirsch and Monster or Ault and Straightline (with Rinde and CKR as Escrow Agent), Ori met with Rinde at CKR's offices in New York, wherein Rinde himself pitched the loan program, and Rinde solicited Ori to put $400,000 in escrow. Ori declined to participate in the

loan program – in addition to warning Rinde that Rinde was likely breaking the law by participating in the program.

### *Minnesota: William Krake, Adam Cozine, Brian Farrell, Timothy Nichols, PropCo*

58.     In 2015, PropCo Capital Trust LLC ("PropCo") was seeking funding for a $129 million USD project to build a mall in Albertsville, Minnesota.

59.     On December 8, 2015, PropCo entered into an agreement with Ault, Straightline, Rinde, and CKR to secure funding.

60.     The agreement required PropCo to contribute $4,680,000 to the escrow fund and purportedly required Straightline to contribute $5,616,000 to the escrow fund, purportedly to secure the $129 million USD loan.

61.     When PropCo could not come up with the money, Straightline and Ault later revised the agreement to allow PropCo to contribute only $150,000 to the escrow funds (with Straightline contributing the rest pursuant to a promissory note dated December 17, 2015), with an additional $250,000 to be paid directly to Straightline for administrative fees.

62.     PropCo borrowed the $150,000 to put into the escrow from Krake, Cozine, and Farrell.

63.     To date, the PropCo loan has never been disbursed.

64.     Ault and Straightline never put the nearly $10 million into escrow pursuant to the agreement. Ault claimed at deposition that this was due to bank "compliance issues."

65.     Upon information and belief, the true purpose of the transaction was simply to extract $400,000 from PropCo, Krake, Cozine, and Farrell.

66.     The $400,000 has not been returned to the relevant parties.

67.     This transaction is currently the subject of a lawsuit pending in the State of Minnesota, Hennepin County, Court File No.: 27-CV-18-11206.

### New York: Wayne DeMilia and MarWay Entertainment

68.     On July 24, 2014, Wayne DeMilia of Marway Entertainment provided the Defendants with $75,000 to secure a loan in the amount of $6 million USD. The loan was never disbursed and the $75,000 has not been returned. This transaction is currently the subject of a pending lawsuit in the State of New York, County of Rockland, Index #: 34680/2019.

### Pennsylvania: John Lubimir

69.     Upon information and belief, John Lubimir sought financing through the Defendants in or around March 2019. Lubimir sought $14-15 million USD in loans and was required to put $600,000 in escrow to secure the loan. The loan was never disbursed, and the escrow has not been returned.

### Tennessee: Tricia Cunningham

70.     Upon information and belief, Tricia Cunningham sought a loan in an unknown amount from the Defendants in 2015. Ms. Cunningham placed an unknown amount in escrow consistent with the Defendants' scheme. Her loan has never been disbursed, nor have her escrow funds been returned.

### Tennessee: Tricia Cunningham

71.     Upon information and belief, Tricia Cunningham sought a loan in an unknown amount from the Defendants in 2015. Ms. Cunningham placed an unknown amount in escrow consistent with the Defendants' scheme. Her loan has never been disbursed, nor have her escrow funds been returned.

### *Canada: Kevin Granger*

72.     Upon information and belief, Kevin Granger sought financing through the Defendants in or around September 2019. Granger sought $10 million USD in loans and was required to put $400,000 in escrow to secure the loan. The loan was never disbursed, and the escrow has not been returned.

### **Individual Defendants Liable**

### *Jeffrey Rinde*

73.     Upon information and belief, Rinde has failed to abide by corporate formalities in relation to CKR, which are part and parcel of the corporate existence, including but not limited to, production and retention of corporate minutes and records.

74.     Upon information and belief, CKR maintained, and continues to maintain, inadequate capitalization to be deemed a separate entity from Rinde.

75.     Upon information and belief, Rinde and CKR intermingled personal and business funds.

76.     Upon information and belief, Rinde exercised complete domination over the CKR entity, which functioned solely under the discretion of Rinde.

77.     Moreover, as set forth above, Rinde has utilized the corporate entity, CKR, to perpetrate fraud upon Gem City (and others).

### *Donald Hirsch*

78.     Upon information and belief, Hirsch has failed to abide by corporate formalities in relation to Monster Capital with are part and parcel of the corporate existence, including but not limited to production and retention of corporate minutes and records.

79.     Upon information and belief, Monster maintained, and continues to maintain, inadequate capitalization to be deemed a separate entity from Hirsch.

80.     Upon information and belief, Hirsch and Monster intermingled personal and business funds.

81.     Upon information and belief, Hirsch and Monster shared common addresses and phone numbers; the business address of Monster is an empty storefront, which previously held a tanning salon business that was also owned by Hirsch.

82.     Upon information and belief, Hirsch exercised complete domination over the Monster entity, which functioned solely under the discretion of Hirsch.

83.     Moreover, as set forth above, Hirsch has utilized the corporate entity, Monster, to perpetrate fraud upon Gem City (and others).

### Rick Siegel

84.     Upon information and belief, Siegel has failed to abide by corporate formalities in relation to Safari, which are part and parcel of the corporate existence, including but not limited to, production and retention of corporate minutes and records.

85.     Upon information and belief, Safari maintained, and continues to maintain, inadequate capitalization to be deemed a separate entity from Siegel.

86.     Upon information and belief, Siegel and Safari intermingled personal and business funds.

87.     Upon information and belief, Siegel and Safari shared common addresses and phone numbers; the business address of Safari is a home, which appears to also have been Siegel's residence at one point in time.

88.     Upon information and belief, Siegel exercised complete domination over the Safari entity, which functioned solely under the discretion of Siegel.

89.     Moreover, as set forth above, Siegel has utilized the corporate entity, Safari, to perpetrate fraud upon Gem City (and others).

**COUNT I**
*RICO § 1962(c)*

90.     The allegations of the foregoing paragraphs are incorporated herein by reference.

91.     This Count is against all Defendants.

92.     The Defendants and their affiliated corporate entities are an enterprise engaged in and whose activities affect interstate commerce. The Defendants are employed by or associated with the enterprise.

93.     The Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern common tortious activity including a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff as set forth above.

94.     The predicate acts set forth above constitute a joint enterprise including a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

95.     The Defendant(s) have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

96.     As a direct and proximate result of the Count I Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in their business and property in that: Plaintiff has been deprived of its ownership of $480,000, has lost business as a result of the fraud, and has incurred additional and substantial expenses associated with securing financing in order to stay in business.

## COUNT II

### *RICO § 1962(d)*

97.     The allegations of the foregoing paragraphs are incorporated herein by reference.

98.     This count is against all Defendants.

99.     As set forth above, the Defendants agreed and conspired to violate 18 U.S.C. § 1962(c).

100.    The Defendants have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(c), in violation of 18 U.S.C. § 1962(d). As direct and proximate result of the Defendant(s)' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in their business and property.

## COUNT III

### *Breach of Contract*

101.    The allegations contained in the foregoing paragraphs are repeated and re-alleged as if fully set forth herein.

102.    Defendants committed breach of contract by failing to perform under the Loan Agreement, Escrow Agreement, Refund Guarantee, and ancillary agreements.

103.    Plaintiff performed fully in accordance with the above agreements.

104.    Plaintiffs have or will incur additional, special, and consequential damages in relation to Defendants' failure to perform under the agreements.

105.     Defendants failed to provide the consideration for which Plaintiffs paid; specifically, Defendants have failed to provide the loan which was the subject of the above agreements.

106.     Plaintiffs are entitled to a refund of all moneys paid under the agreements, including the $480,000  paid into Escrow.

107.     In addition, Plaintiff is entitled to judgment against Defendants for compensatory money damages, including interest, investigation expenses, expert fees, and other fees related to Defendants' failure to disburse the loan or return the Escrow, punitive damages, attorney fees, and all other costs incurred in this litigation.

108.     Upon information and belief, that, as a direct and proximate result of the foregoing breach of the Contract, and the actions and/or omissions of Defendants, Plaintiff has sustained general, special, consequential and incidental damages in an amount presently unknown, in that Plaintiff has incurred business losses as a result of Defendants' conduct.  Plaintiffs will establish the precise amount of damages at trial, according to proof.

## COUNT IV

### *Fraudulent Inducement*

109.     The allegations contained in the foregoing paragraphs are repeated and re-alleged as if fully set forth herein.

110.     In negotiating the Loan Agreement, Donald Hirsch represented to Plaintiff that he had successfully completed over 50 similar loans.

111.     In negotiating the Loan Agreement, Donald Hirsch represented to Plaintiff that the counterparty funding the loan was an international gas and oil company.

112.     In negotiating the Initial Contract, Donald Hirsch represented to Plaintiff that Rinde/CKR had never failed to secure the loan funds on any previous loan agreement.

17

113.    In negotiating the Loan Agreement, Rinde/CKR guaranteed that return of the escrow funds would occur if the loan transaction failed.

114.    All of these statements were patently false.  The Defendants have upon information and belief never successfully funded a loan under the program.

115.    The representations made by Hirsch and Rinde/CKR as set forth above were patently false at the time they were made.

116.    The false representations made by Hirsch and Rinde/CKR to Plaintiffs set forth above were material to the loan agreement.

117.    Hirsch and Rinde/CKR had knowledge of the falsity of the representations at the time they made them.

118.    Hirsch and Rinde/CKR made these false material representations with the intent to induce Plaintiff into the loan agreement.

119.    Plaintiff justifiably relied on these statements.

120.    Plaintiffs suffered actual damages in an amount to be proven at trial, but not less than $480,000.

121.    Upon information and belief, that, as a direct and proximate result of the foregoing Fraud, and the actions and/or omissions of Defendants, Plaintiff has sustained general, special, consequential and incidental damages, plus punitive damages and attorney fees in an amount presently unknown. Plaintiff will establish the precise amount of damages at trial, according to proof.

122.    Defendants' actions were gross, wanton, willful, and morally culpable.

123.    Defendants' conduct towards Plaintiff is only one example of a scheme that is nationwide in scope and has caused millions in losses to numerous parties.

124.    Plaintiffs are entitled to punitive damages in an amount to be determined at trial.

## COUNT V
### *Conspiracy*

125.    The allegations contained in the foregoing paragraphs are repeated and re-alleged as if fully set forth herein.

126.    Plaintiff has properly pleaded the cognizable tort of Fraud as set forth above.

127.    The Defendants acted in concert and agreement with the purpose of defrauding Plaintiff.

128.    Each of the Defendants took overt action as set forth above.

129.    As such, all Defendants are jointly and severally liable for all damages resulting from the underlying tort, as set forth above.

## COUNT VI
### *Unjust Enrichment*

130.    The allegations contained in the foregoing paragraphs are repeated and re-alleged as if fully set forth herein.

131.    As a result of the conduct described above, the Defendants have been unjustly enriched in an amount to be proven at trial, to the detriment of Plaintiffs.

## COUNT VII
### *Conversion*

132.    The allegations contained in the foregoing paragraphs are repeated and re-alleged as if fully set forth herein.

133.    In perpetrating the scheme set forth above, Defendants, with intent to deprive Plaintiff of $480,000, did in fact interfere with and exercise dominion over the funds, including refusal to return the funds, in derogation of Plaintiff's ownership rights.

## <u>COUNT VIII</u>

### *Breach of Fiduciary Duty*

134.    The allegations contained in the foregoing paragraphs are repeated and re-alleged as if fully set forth herein.

135.    This count is against Rinde and CKR.

136.    In perpetrating the scheme as set forth above, Defendants Rinde and CKR purported to act as escrow agent in the subject transaction.

137.    It is well-settled that an escrow agent owes the parties to a transaction a fiduciary duty.

138.    Defendants Rinde and CKR failed to abide their fiduciary duty to Plaintiff, in that

139.    Defendants Rinde and CKR had actual knowledge of the fraudulent nature of the transaction and that no prior transaction had been successful and failed to make such disclosures to Plaintiff, and also in that Rinde and CKR released the Escrow funds in violation of the escrow agreement.

140.    Upon information and belief, Rinde and CKR benefitted from releasing the Escrow without the conditions being satisfied and acted in bad faith.

WHEREFORE, Gem City seeks judgment as follows:

   a.  Against Defendants, jointly and severally, awarding Plaintiff actual damages in an amount not less than $480,000, plus pre and post judgment interest;

   b.  Treble damages as permitted by statute, not less than $1,460,000;

   c.  Special, consequential and incidental damages to be established at trial;

   d.  Attorneys' fees and costs incurred in bringing this action pursuant to statute;

   e.  Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
September 14, 2021

**NEWMAN FERRARA LLP**

By:   _s/ Jeffrey M. Norton_
        Jeffrey M. Norton
        Benjamin D. Baker
1250 Broadway, 27th Floor
New York, NY 10001
(212) 619-5400
jnorton@nfllp.com
bbaker@nfllp.com

**HENNIS ROTHSTEIN ELLIS LLP**
Steven M. Rothstein
10895 Indeco Dr.
Cincinnati, OH 45242
(513) 715-8717
srothstein@hennisrothstein.com

*Attorneys for Plaintiff*