## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

GEM CITY MANAGEMENT INC.,

                Plaintiff,

   -against-

JEFFREY RINDE, CKR LAW LLP,
DONALD HIRSCH, MONSTER CAPITAL
CORP., SAFARI TRADING LLC, and RICK
SIEGEL,

             Defendants.

Index No.:  21-cv-7676

**AMENDED COMPLAINT**

---

Plaintiff Gem City Management Inc. ("Gem City" or "Plaintiff"), for its Amended Complaint against defendants Jeffrey Rinde, CKR Law LLP, Donald Hirsch, Monster Capital Corp., Safari Trading LLC, and Rick Siegel (collectively, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1.     This action arises from a repeated and ongoing scheme perpetrated by Defendants against victims in a variety of states, whereby Defendants conspired to, and executed, a plan to defraud victims out of hundreds of thousands of dollars, with an aggregate loss to the victims of millions of dollars, through the requirement of advance fees to participate in a fraudulent loan scheme.

2.     Using a scheme employing a variety of complicated corporate entities that Defendants represented were legitimate, Defendants conspired to defraud Gem City, and others, out of hundreds of thousands of dollars in "advance fees" in order to obtain millions of dollars in non-existent loans.

3.     Defendants' highly-sophisticated scheme was in essence an advance fee scheme disguised to appear to be a legitimate investment and loan operation crafted by Defendants to reap enormous profits, all at the expense of Plaintiff who, at all times, entrusted Defendants to provide guidance and eventually legal advice.

4.     Defendants' scheme involved the following features, each meant to add credibility and legitimize the fraudulent scam:

    a.  Offering returns on investments that were disproportionate to the risk involved;

    b.  Mimicking legitimate financial instruments, with complicated and lengthy contractual agreements;

    c.  Asking for payment of an advanced fee prior to funding or initiating the loan or investment;

    d.  Allegedly transferring funds overseas and using foreign banks;

    e.  Improper referencing to legitimate financial institutions (likely without the financial institutions' knowledge or consent);

    f.  Intricate explanations and excuses as to why the promised funds failed to materialize; and

    g.  The fraudulent use of escrow accounts, including attorney escrow accounts.

5.     In short, Defendants' scheme was to offer prospective loan recipients "loans" in the millions of dollars so long as the loan recipients first put hundreds of thousands of dollars in escrow to secure the loan, which, ultimately was never disbursed, and the escrow amount was never returned.

6.     Here, Gem City, as the prospective loan recipient, was offered $12 million in loans but was first required to deposit $480,000 in escrow to "secure" said loan.

7.      Although the precise structure of the Defendants' scheme is well-concealed as a result of its intentional complexity, it is evident that Defendants represented to Gem City that they had negotiated a secured term loan for $12 million, and that Gem City would begin to receive funds after depositing $480,000 in an escrow account. While Gem City fulfilled its obligation to fund the $480,000, the millions in promised loan proceeds were never delivered and the $480,000 advance fee was never returned to Gem City.

8.      As a result of the Defendants' actions, Gem City has been harmed financially and seeks to recover damages to make it whole again.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, 18 U.S.C. §§ 1962 and 1964.

10.     Plaintiff is an Ohio corporation with its principal place of business in Ohio. The corporate Defendants are either incorporated and/or have their principal place of business in California, Illinois, Florida, and/or New York, and the individual Defendants are domiciled in either Connecticut, Illinois, Florida, and/or New York. Therefore, complete diversity of citizenship exists. The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

11.     Supplemental jurisdiction over the common law and State law claims alleged herein is available under 28 U.S.C. §1367(a) as they arise from the same core of operative facts as those arising under 28 U.S.C. § 1332, 18 U.S.C. §§ 1962 and 1964 and are therefore properly brought before the Court.

12.     Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Defendants, in particular Jeffrey Rinde and CKR Law LLP, reside, are found, have

agents, and transact their affairs as alleged herein within this district, and a substantial part of the events or omissions giving rise to the action occurred within this district.

## CHOICE OF LAW AND FORUM SELECTION

13.     The November 12, 2019 Memorandum of Understanding ("MOU") contains a Governing Law provision specifying that "all matters relating to or arising out of the Proposed Transactions and the other transactions contemplated hereby and the rights of the parties (sounding in contract, tort, or otherwise) will be governed by and construed and interpreted under the laws of New York…." (MOU, Section 9(c)).

14.     The November 12, 2019 Escrow Agreement  ("Escrow Agreement") contains a Governing Law provision that also specifies New York law as controlling and includes a forum selection provision that provides for the adjudication of disputes "arising from th[e] Escrow Agreement … by binding arbitration in City, County and State of New York." (Escrow Agreement, Section 16). Notably, the Escrow Agreement's arbitration provision lacks any specifics regarding delegation of authority, responsibility for costs, or the type of arbitration required.

15.     Further, notwithstanding the forum selection clause contained in the Escrow Agreement, the December 19, 2019 Term Loan Agreement ("Term Loan Agreement"), entered into subsequent to the Escrow Agreement, contains a superseding forum selection provision that specifies "***federal courts sitting in New York*** ***" as the "*exclusive jurisdiction … for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein….*" (Term Loan Agreement, Section 9.2) (emphasis added).

16.     The Term Loan Agreement also contains an "entire agreement" provision that unambiguously provides for all provisions contained therein to control with regard to *all* aspects of the transaction involving Gem City and all Defendants:

> This Agreement and the other Transaction Documents supersede all other prior oral or written agreements between the Investor, Borrower, their Affiliates and Persons acting on their behalf with respect to the matters discussed herein and therein, and this Agreement, the other Transaction Documents and the instruments referenced herein and therein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Borrower nor the Investor makes any representation, warranty, covenant or undertaking with respect to such matters.

(Term Loan Agreement, Section 9.6).

17.     Accordingly, despite the arbitration provision contained in the earlier Escrow Agreement, it is clear that the subsequent forum selection provision in the Term Loan Agreement controls, and that any potential arbitration of this action is "specifically precluded." *See Goldman, Sachs & Co. v. Golden Empire Schools Fin. Auth.*, 764 F.3d 210, 215 (2d Cir. 2014) ("In this Circuit, an agreement to arbitrate is superseded by a later-executed agreement containing a forum selection clause if the clause 'specifically precludes' arbitration . . . but there is no requirement that the forum selection clause mention arbitration."); *Hyuncheol Hwang v. Mirae Asset Sec. (USA) Inc*., 165 A.D.3d 413, 414-15 (1st Dep't 2018) (Under "[New York] contract law principles … a subsequent contract regarding [forum selection] will supersede the prior contract.").

18.     Moreover, because the Term Loan Agreement's forum selection specifically precludes the adjudication of disputes related to Gem City's loan in arbitration, the forum selection provision in the Escrow Agreement cannot be considered valid based on the apparent lack of a meeting of the minds. *See Applied Energetics, Inc. v. NewOak Cap. Markets, LLC*, 645 F.3d 522, 526 (2d Cir. 2011) ("A party cannot be required to submit to arbitration any dispute which it has not agreed so to submit," and "because the parties dispute not the scope of an arbitration clause

but whether an obligation to arbitrate exists, the presumption in favor of arbitration does not apply.").

## PARTIES

19.     Plaintiff Gem City is an Ohio corporation with its principal place of business in Dayton, Ohio.  Gem City is involved in the cultivation of legal marijuana in Ohio.  All of Gem City's shareholders reside in Ohio.

20.     Defendant CKR Law LLC ("CKR") is a limited liability partnership formed under the laws of California, with its principal place of business at 1330 Avenue of the Americas, 12th & 14th Floors, New York, New York 10019. CKR promotes itself as a global law firm operating through various separate and distinct legal entities.

21.     Defendant Jeffrey Rinde ("Rinde") is a resident of the State of Connecticut. Rinde is, and at all relevant times was, an attorney licensed to practice in the State of New York and the State of Connecticut. Rinde is a named partner, co-founder, and at all times relevant to this action, the Managing Partner of CKR.

22.     Defendant Donald Hirsch ("Hirsch") is a resident of the State of Illinois. Hirsch is, and at all relevant times was, the owner, manager, and/or principal of Monster Capital Corp.

23.     Defendant Monster Capital Corp. ("Monster") is a Limited Liability Company with its principal place of business in Hoffman Estates, Illinois. Monster, and its predecessor, Euwana Capital LLC, purportedly specialize in providing financing solutions for projects requiring at least $10 million.  Monster has business address of 146 W. Higgins Rd., Hoffman Estates, IL 60169 – an empty storefront in a strip mall.

24.     Defendant Rick Siegel ("Siegel") is a resident of the State of Florida. Siegel is affiliated with Rinde, CKR, and Hirsch, assisted them in promoting the loan programs under the

various corporate entities, and partook in the ill-gotten proceeds.  Siegel is the owner of Safari Trading LLC.

25.     Defendant Safari Trading LLC ("Safari") is a Limited Liability Company with its principal place of business designated as what appears to be Siegel's home, at either 635 Avenue H, Delray Beach, FL 33483 or 2974 Needham Court, Delray Beach, FL, 33445.

## THE DEFENDANTS' FRAUDULENT LOAN SCHEME

26.     In late 2019, Gem City was seeking financing in order to develop a legal marijuana cultivation facility, and for other corporate uses.

27.     The cannabis industry is an emerging industry rife with complex regulatory and legal issues; traditional lenders, such as banks, do not typically provide financing for such operations.

28.     In September or October 2019, after being introduced by broker Bill Stroud of Nationwide Cannabis Funding LLC, Gem City had a call with Hirsch (Monster's principal), who pitched a loan program to Plaintiff.

29.     In October 2019, Hirsch/Monster provided an initial proposal to provide approximately $12 million in financing to Gem City.

30.     Hirsch also introduced Gem City to his business partner, Siegel (principal of Safari), and together they assured Gem City that they had successfully closed numerous other loans similar to the loan being negotiated, using an international corporation as a counterparty.

31.     On November 14, 2019, Hirsch/Monster and Gem City executed an MOU with respect to the proposed financing. The MOU provided that, upon completion of certain conditions precedent, Gem City would receive its initial advance of $1.2 million and a total loan in the amount of $12 million.

32.     Upon the express direction of Hirsch and Siegel, Rinde/CKR was retained by Monster and Gem City to act as an Escrow Agent for the transaction.

33.     On November 12, 2019, the parties executed an Escrow Agreement which provided, *inter alia*, that CKR, as Escrow Agent, would hold Gem City's deposit of $480,000 in CKR's attorney trust account – funds that would be returned to Gem City in the even the loan proceeds were not secured and delivered to Gem City through Monster, Safari, and CKR.

34.     Through emails and numerous telephonic discussions, Rinde repeatedly assured Gem City that its escrowed funds were "secure."

35.     In fact, under the terms of the Escrow Agreement, no funds could be released unless and until all of the following conditions were satisfied:

   a.   Rinde/CKR's receipt of the SWIFT MT760 with "Answer Back" from Monster's designated investor bank, confirming the issuance and successful transmission of funds available to Monster; and

   b.   Rinde/CKR's receipt of Monster's contractual commitment from an investor to fund the full loan amount.

36.     Nevertheless, despite the fact that *neither* of the conditions set forth in the Escrow Agreement were met, sometime between December 2019 and August 2020, Rinde/CKR appears to have released the entirety of Gem City's escrowed funds, converting the same for either Defendants' own use or to some presently-unknown third-party.

37.     Growing increasingly concerned with the legitimacy of the loan arrangement, on or about November 25, 2019, during a call with Hirsch/Monster and Siegel/Safari, Gem City sought, and received, a written guarantee from Safari and CKR (the "Safari/CKR Guarantee") that if the loan transaction were to fail (and for some reason the deposited escrow funds could not be returned

immediately), Safari would direct CKR to release $480,000 of some $10 million of Safari's funds that CKR was apparently holding. The Safari/CKR Guarantee was signed by Siegel/Safari and Rinde/CKR.

38.     The Safari/CKR Guarantee is notable for several reasons: first, it evidences a subsequent and superseding contractual commitment to repay Gem City their advance fee outside the confines of the Escrow Agreement; second, it evidences a side agreement between co-conspirators Rinde/CKR and Siegel/Safari regarding Gem City's funds; and, finally, it serves as a concession as to the illegitimacy of the Escrow Agreement which, if carried out as legally required, would not need a guarantee to safeguard Gem City's funds.

39.     The only condition precedent required by Gem City for it to receive the first $1.2 million payment, was for it to place $480,000 in escrow with Rinde/CKR, which it did on December 12, 2019.

40.     That same day, Siegel – who was in regular contact with Rinde – confirmed via text message Gem City's $480,000 "deposit" was received.

41.     Then, on December 19, 2019, Hirsch/Monster executed an agreement (the "Monster Guarantee"), which guaranteed that if Gem City did not receive the initial loan payment within 100 days of depositing its escrow funds with Rinde/CKR, Hirsch/Monster would take all necessary action to ensure the release of Plaintiff's funds from escrow, and terminate the Term Loan Agreement.

42.     Much like the Safari/CKR Guarantee, the Monster Guarantee is notable because it confirms both Hirsh/Monster's control over Gem City's funds and the collective control of those funds by and among co-conspirators Rinde/CKR, Hirsh/Monster, and Siegel/Safari.

43.     Furthermore, the Monster Guarantee makes clear that Gem City has no obligation to first demand the return of its funds if the loan payments do not materialize within 100 days.

44.     The financing and loan transaction purportedly closed on December 19, 2019, and was memorialized in the Term Loan Agreement, Note, Pledge, and Security Agreement, all dated December 19, 2019.

45.     The Term Loan Agreement provided all of the essential terms for the purported transaction (*i.e.*, Defendants' scheme), including those from all "Transaction Documents … including all other prior oral or written agreements between the Investor, Borrower, their Affiliates and Persons acting on their behalf with respect to the matters discussed herein and therein …(including the Escrow Agreement)." (Term Loan Agreement § 9.6).

46.     After the Term Loan Agreement was executed, and Gem City did not received its agreed-upon funds, Siegel suggested contacting Rinde through the messaging app WhatsApp.

47.     The execution of the Term Loan Agreement also changed the Defendants' roles in the scheme – while Gem City was still in frequent communication with Hirsch/Monster and Siegel/Safari, Rinde took on the primary role of finding an investor and securing funds to back Gem City's loan (evidencing that Rinde's role in the scheme was far more involved than that of an escrow agent).

48.     In March 2020, after first falsely confirming in a text message that he had received the loan funds to disburse to Gem City, Rinde conceded that, in fact, he had not yet received any funding for the loan – specifically telling Gem City that the funds had not "hit[ the] law firm's account" as of March 23, 2020.

49.     Then, April 2020, Rinde once again falsely informed Gem City that he and CKR had received the funds for the loan and sent what he described as "proof of the transfer," a

fraudulent document which showed a purported transfer of $49.5 million Euros from The Commercial Bank of Qatar to Rinde/CKR from February 26, 2020 – the same time period when Rinde had previously informed Gem City that funds from an investor had neither been secured nor received.

50.    On or about April 2, 2020 – more than 100 days after Gem City deposited its escrow funds – the promised loan funds were still not disbursed, and Plaintiff requested the return of its $480,000 in accordance with its rights under the above agreements.

51.    Rinde/CKR continually fed excuses to Gem City as to why the loan funds could not be delivered on time in accordance with the various loan agreements. For instance, in or around March 2020, Rinde claimed that the funding was held up by the COVID-19 pandemic. Then, on or about March 17, 2020, Rinde told Gem City that the funds were "held up" in London. Similarly, on or about April 15, 2020, Rinde told Gem City that the "Feds" had seized the funds. On or about August 3, 2020, Rinde claimed that the funds were held up due the actions of certain unnamed persons "in the middle east." And, on or about January 27, 2020, February 8, 2020, and May 29, 2020, Rinde claimed that he was unavailable to release the funds because he was "stuck in China" or "stuck in Cambodia" due to the Covid-19 pandemic.

52.    All of these excuses, of course, were lies which were known to have been false when made.

53.    Rinde's repeated assertions that he would deliver the loan proceeds to Gem City and that the escrow funds held by CKR were safe (or otherwise guaranteed by CKR and Safari without regard to the Escrow Agreement) were unmistakably false.

54.     As a result of Defendants' scheme to steal nearly half a million dollars from Gem City, Gem City never received the promised loan proceeds or even a return of its $480,000 advance fee.

## CULPABLE PERSONS

55.     Each of the named Defendants are people or entities capable of holding a legal or beneficial interest in property.

## ENTERPRISE

56.     The named Defendants constitute an established enterprise-in-fact; the purpose of such enterprise being solely to unlawfully deprive prospective loan clients of significant sums of money, to the benefit of defendants.

## INTERSTATE/FOREIGN COMMERCE

57.     The escrow fund wire from Plaintiff, took place from Ohio, and was sent to a New York account. Telephone calls and mailings in furtherance of the scheme have been made to and from Ohio, Illinois, Florida and New York.

58.     Further, the similar prior misconduct alleged in paragraphs 62-112 involved the Defendants directing their victims to engage in interstate and international wire transfers between Arizona, Florida, Illinois, Michigan, Minnesota, New York, Pennsylvania, Tennessee, Canada, Hong Kong, and likely elsewhere.

## PATTERN OF RACKETEERING ACTIVITY

59.     The   Defendants have engaged in at least two acts of racketeering activity which occurred within the last ten (10) years; acts that have the same or similar purposes, results, participants, victims, methods of commission, or otherwise interrelated by distinguishing characteristics and are not isolated events.

60.     The scheme consists of numerous related predicate acts, extending over a substantial period of time: since at least 2019 in connection with Gem City; and from at least 2014 in connection with a number of other victims in strikingly similar circumstances.

61.     Further, given that the last presently-known victims were defrauded in 2019 and the Defendants are upon information and belief continuing to advertise the loan program, there is a substantial threat of continuing criminal conduct.

### SIMILAR PRIOR MISCONDUCT

62.     A series of similar acts by Defendants are set forth in cases 20-cv-2898, 21-cv-1565, and 21-cv-2321 in the Southern District of New York, including:

#### *Arizona: Dr. Keith E. Pyne and Enrico Desiata*

63.     In or around August 2014, Dr. Keith E. Pyne ("Pyne") and Enrico Desiata ("Desiata") were convinced to invest $200,000 and $500,000, respectively, into an investment vehicle purportedly crafted by or operated by Siegel and David Ault ("Ault").

64.     On August 31, 2014 Rinde and CKR were retained to represent Pyne and Desiata in connection with the transaction.

65.     On September 2, 2014, Pyne and Desiata entered into a substantially similar agreement to the Term Loan Agreement in the instant matter.

66.     As part of the transaction, the parties entered into an escrow agreement whereby the $700,000 in funds that Pyne and Desiata had offered would be transferred into an escrow account that was controlled by CKR and then used to obtain and monetize the investment vehicle.

67.     Pyne and Desiata never received any distributions to which they were purportedly entitled, and they were instead offered numerous baseless excuses by Rinde and Siegel about what had happened to their funds and why they had not received any returns.

13

68.     For five years Rinde represented that the funds from the purported escrow account would be wired and credited to CKR's account in short order and then transferred to Pyne and Desiata.

69.     Despite the estimated growth of their $700,000 investment to $200,000,000, with approximately $100,000,000 located in CKR's Citibank account, neither Pyne nor Desiata ever received any distribution and they never recovered their funds from the escrow account.

70.     Pyne and Desiata's action was filed in the Southern District of New York under case number 21-cv-01565.

### *Arizona: Steve O'Neill*

71.     On June 24, 2015, Ault, Straightline LLC ("Straightline"), Rinde, and CKR entered into a substantially similar agreement to the instant matter with non-party L3gacy Growth Fund, LLC ("L3gacy").

72.     L3gacy sought a $9 million USD loan. Rinde, Ault, Siegel, and Hirsch required $350,000 to be placed in escrow to secure the loan. Ault and Straightline provided assurances regarding their ability to secure the loan, and Rinde and CKR provided assurances that the escrow would be held until the loan funds were secure.

73.     The $350,000 escrow was provided by non-party Steve O'Neill. The funds were wired on July 2, 2015, from Arizona to CKR's account at Citibank in New York.

74.     The loan funds were never secured or disbursed; however, Rinde and CKR released the Escrow funds.

75.     On May 4, 2017, Steve O'Neill secured a judgment directing the return of the Escrow funds.

76.     To date, the Escrow funds have not been returned to Mr. O'Neill. The matter is ongoing in the Superior Court of the State of Arizona, County of Maricopa, under Case No.: CV2016-016821.

### Florida: Luxury International Brands, Inc.

77.     Luxury International Brands, Inc. ("Luxury Int'l") sought financing through the Defendants in or around June 2018. Luxury Int'l sought $20 million USD in loans and was required to put $150,000 in escrow to secure the loan. The loan was never disbursed, and the escrow has not been returned.

78.     This transaction is currently the subject of a lawsuit pending in the Circuit Court of the 17th Judicial Circuit, in and for Broward County, Florida: CACE 21-010462.

### Illinois: Tony Ciccarelli

79.     Upon information and belief, Tony Ciccarelli sought financing through the Defendants in or around March 2019. Ciccarelli sought $10 million USD in loans and was required to put $400,000 in escrow to secure the loan. The loan was never disbursed, and the escrow has not been returned.

### Illinois: Rick Silverstein

80.     Upon information and belief, Rick Silverstein sought financing through the Defendants in or around October 2019. Silverstein sought $10 million USD in loans and was required to put $400,000 in escrow to secure the loan. The loan was never disbursed, and the escrow has not been returned.

### Illinois: Joseph Ori

81.     Upon information and belief, in or around June 2019, Joseph Ori sought financing through the Defendants. Unlike the other predicate acts, wherein loan seekers sought financing

primarily through Hirsch and Monster or Ault and Straightline (with Rinde and CKR as Escrow Agent), Ori met with Rinde at CKR's offices in New York, wherein Rinde himself pitched the loan program, and Rinde solicited Ori to put $400,000 in escrow. Ori declined to participate in the loan program – in addition to warning Rinde that he was likely breaking the law by participating in the program.

### Michigan: DCH Licensing L.L.C.

82.     In early 2019, DCH Licensing L.L.C. ("DCH") was seeking financing in order to develop a legal marijuana cultivation facility, and for other corporate uses.

83.     On January 28, 2019, Hirsch pitched the loan program he offered through his companies, Euwana Capital LLC and Monster, to DCH.

84.     As part of both Hirsch's sales pitch, he described "work[ing] with a top New York law firm with international offices to handle our transactional requirements and closing process."

85.     Hirsch and Ault further assured DCH that they "[were] not doing anything innovative" with the loan, and that they had closed "at least 50" similar loans, and that there was never an issue because their transactional attorney "never misses" and there is "never any problems with the money."

86.     In reality, the loan program had never disbursed any funds, to any client, since the Defendants began their scheme in 2014.

87.     Thereafter, Plaintiff was introduced to Rinde, Managing Partner of CKR Law, who prepared an Escrow Agreement that was executed on March 22, 2019, to hold $400,000 of DCH's money until the $10 million loan was secured.

88.     On June 5, 2019, on a recorded call, Rinde informed DCH that he did not know where the loan money was, and that "this has never happened before."

89.     On June 25, 2019, Rinde claimed "the Feds" had seized the money, and that he was going to have meetings in Washington, D.C. to try and release the loan funds, and he continued to make this assertion throughout August 2019.

90.     Then, on a January 16, 2020 phone call, Rinde admitted that he had already released the escrow funds – in direct violation of the Escrow agreement between the parties – and Rinde contended that the conditions of release had been met.

91.     Rinde never offered proof of the conditions of release being met, but instead, upon information and belief, the escrow funds were simply distributed between and amongst Ault, Siegel, and Rinde.

92.     Based on all publicly available information, DCH's funds were never returned. DCH's action was filed in the Southern District of New York under case number 20-cv-02898.

### *Minnesota: William Krake, Adam Cozine, Brian Farrell, Timothy Nichols, PropCo*

93.     In 2015, PropCo Capital Trust LLC ("PropCo") was seeking funding for a $129 million USD project to build a mall in Albertsville, Minnesota.

94.     On December 8, 2015, PropCo entered into an agreement with Ault, Straightline, Rinde, and CKR to secure funding.

95.     The agreement required PropCo to contribute $4,680,000 to the escrow fund and purportedly required Straightline to contribute $5,616,000 to the escrow fund, purportedly to secure the $129 million USD loan.

96.     When PropCo could not come up with the money, Straightline and Ault later revised the agreement to allow PropCo to contribute only $150,000 to the escrow funds (with Straightline contributing the rest pursuant to a promissory note dated December 17, 2015), with an additional $250,000 to be paid directly to Straightline for administrative fees.

97.     PropCo borrowed the $150,000 to put into the escrow from Krake, Cozine, and Farrell.

98.     To date, the PropCo loan has never been disbursed.

99.     Ault and Straightline never put the nearly $10 million into escrow pursuant to the agreement. Ault claimed at deposition that this was due to bank "compliance issues."

100.    Upon information and belief, the true purpose of the transaction was simply to extract $400,000 from PropCo, Krake, Cozine, and Farrell.

101.    The $400,000 has not been returned to the relevant parties.

102.    This transaction is currently the subject of a lawsuit pending in the State of Minnesota, Hennepin County, Court File No.: 27-CV-18-11206.

### New York: Wayne DeMilia and MarWay Entertainment

103.    On July 24, 2014, Wayne DeMilia of Marway Entertainment provided the Defendants with $75,000 to secure a loan in the amount of $6 million USD. The loan was never disbursed and the $75,000 has not been returned. This transaction is currently the subject of a pending lawsuit in the State of New York, County of Rockland, Index #: 34680/2019.

### Pennsylvania: John Lubimir

104.    Upon information and belief, John Lubimir sought financing through the Defendants in or around March 2019. Lubimir sought $14-15 million USD in loans and was required to put $600,000 in escrow to secure the loan. The loan was never disbursed, and the escrow has not been returned.

### Tennessee: Tricia Cunningham

105.    Upon information and belief, Tricia Cunningham sought a loan in an unknown amount from the Defendants in 2015. Ms. Cunningham placed an unknown amount in escrow

consistent with the Defendants' scheme. Her loan has never been disbursed, nor have her escrow funds been returned.

### Canada: Kevin Granger

106.    Upon information and belief, Kevin Granger sought financing through the Defendants in or around September 2019. Granger sought $10 million USD in loans and was required to put $400,000 in escrow to secure the loan. The loan was never disbursed, and the escrow has not been returned.

### Hong Kong: Zhongshan Tandem Plastic Products Co., Ltd.

107.    On or about April 25, 2019, Zhongshan Tandem Plastic Products Co., Ltd. ("Zhongshan") entered into an agreement similar to the one in the instant matter for a loan in the amount of $13.8 million USD to develop, construct, and operate a manufacturing facility.

108.    On or about May 21, 2019, Zhongshan entered into an escrow agreement with Ault and Straightline, whereby Rinde and CKR would serve as the escrow agent to hold Zhongshan's $552,000 deposit toward funding the loan.

109.    The parties also entered into a term loan agreement, executed a pledge and security agreement, and Zhongshan executed a senior secured promissory note, similar to those entered into by Gem City.

110.    In response to Zhongshan's repeated inquiries about the status of its loan, Rinde offered numerous excuses, eventually conceding in March 2020 that he had released the deposit to Straightline and Ault in direct violation of the escrow agreement.

111.    Despite entering into all of the necessary agreements, Zhongshan never received any part of its purported loan.

112.    Zhongshan's action was filed in the Southern District of New York under case number 21-cv-02321.

## INDIVIDUAL DEFENDANTS LIABLE/PIERCING THE CORPORATE VEIL

### *Jeffrey Rinde*

113.    Upon information and belief, Rinde has failed to abide by corporate formalities in relation to CKR, which are part and parcel of the corporate existence, including but not limited to, production and retention of corporate minutes and records.

114.    Upon information and belief, CKR maintained, and continues to maintain, inadequate capitalization to be deemed a separate entity from Rinde.

115.    Upon information and belief, Rinde and CKR intermingled personal and business funds.

116.    Upon information and belief, Rinde exercised complete domination over the CKR entity, which functioned solely under the discretion of Rinde.

117.    Moreover, as set forth above, Rinde has utilized the corporate entity, CKR, to perpetrate fraud upon Gem City (and others).

### *Donald Hirsch*

118.    Upon information and belief, Hirsch has failed to abide by corporate formalities in relation to Monster Capital with are part and parcel of the corporate existence, including but not limited to production and retention of corporate minutes and records.

119.    Upon information and belief, Monster maintained, and continues to maintain, inadequate capitalization to be deemed a separate entity from Hirsch.

120.    Upon information and belief, Hirsch and Monster intermingled personal and business funds.

20

121.    Upon information and belief, Hirsch and Monster shared common addresses and phone numbers; the business address of Monster is an empty storefront, which previously held a tanning salon business that was also owned by Hirsch.

122.    Upon information and belief, Hirsch exercised complete domination over the Monster entity, which functioned solely under the discretion of Hirsch.

123.    Moreover, as set forth above, Hirsch has utilized the corporate entity, Monster, to perpetrate fraud upon Gem City (and others).

### *Rick Siegel*

124.    Upon information and belief, Siegel has failed to abide by corporate formalities in relation to Safari, which are part and parcel of the corporate existence, including but not limited to, production and retention of corporate minutes and records.

125.    Upon information and belief, Safari maintained, and continues to maintain, inadequate capitalization to be deemed a separate entity from Siegel.

126.    Upon information and belief, Siegel and Safari intermingled personal and business funds.

127.    Upon information and belief, Siegel and Safari shared common addresses and phone numbers; the business address of Safari is a home, which appears to also have been Siegel's residence at one point in time.

128.    Upon information and belief, Siegel exercised complete domination over the Safari entity, which functioned solely under the discretion of Siegel.

129.    Moreover, as set forth above, Siegel has utilized the corporate entity, Safari, to perpetrate fraud upon Gem City (and others).

### <u>CIVIL RICO SUMMARY</u>

130.     The activities of Defendants in the formation and execution of the scheme to defraud their victims has had a pervasive, debilitating, and costly impact on Gem City. Not only were Plaintiff's funds converted by the Defendants, but these funds also were not then available for the lawful operation of Gem City's business. As such, Gem City was not only directly injured by losing the money Defendants stole from escrow, but by devoting significant time and resources to finding a loan that ended up not existing, Plaintiff was also injured in its ability to conduct business.

131.     In connection with the activities giving rise to this action, the Defendants acted with malice, insult, intent and knowledge, and with a wanton and reckless disregard of the rights of Plaintiff and countless other victims.

132.     During the relevant times, the "enterprise," that is the loan program offered through Defendants' collective action, was engaged in interstate commerce, in that escrow funds, telephone calls, and mailings in furtherance of the scheme were sent between various states and countries.

133.     During the relevant times, in connection with the activities giving rise to this action, Defendants Rinde, CKR, Hirsch, Monster, Siegel, and Safari conspired with each other, and with others unknown, to engage in the various activities set forth herein and aided and abetted one another in these activities, all as proscribed and prohibited by 18 U.S.C. §§ 1962(c) and (d).

134.     During the relevant times, and in furtherance of and for the purpose of executing the scheme to defraud, Defendants on numerous occasions used, and caused to be used, mail depositories of the United States Postal Service by both placing and causing to be placed mailings in said depositories, and by removing and causing to be removed, mailings from said depositories, each such use of the mails in connection with the scheme and artifice to defraud and to obtain

money by means of false pretenses, constituting the offense of mail fraud as proscribed and prohibited by 18 U.S.C. § 1341.

135.    During the relevant times, and in furtherance of and for the purpose of executing the scheme to defraud, Defendants, on numerous occasions, used and caused to be used wire communications in interstate and foreign commerce, by both making and causing to be made telephone calls and other wire communications, as proscribed and prohibited by 18 U.S.C. § 1343.

136.    During the relevant times, and in furtherance of and for the purpose of executing the scheme to defraud, Defendants transported or caused to be transported goods and money of the value of Five Thousand Dollars ($5,000.00), or more, in interstate commerce, all as proscribed and prohibited by 18 U.S.C. § 2314.

## COUNT I
### RICO § 1962(c)
### (Against Rinde, CKR, Hirsch, Monster, Siegel, and Safari)

137.    Plaintiff specifically incorporates by reference paragraphs 1-136, *supra*.

138.    This Count is against all Defendants.

139.    The Defendants and their affiliated corporate entities are an enterprise engaged in and whose activities affect interstate commerce. The Defendants are employed by or associated with the enterprise.

140.    The Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern common tortious activity including a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff as set forth above.

141.    The predicate acts set forth above constitute a joint enterprise including a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

142.     The Defendant(s) have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

143.     As a direct and proximate result of the Count I Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in their business and property in that: Plaintiff has been deprived of its ownership of $480,000, has lost business as a result of the fraud, and has incurred additional and substantial expenses associated with securing financing in order to stay in business.

## COUNT II
### RICO § 1962(d)
### *(Against Rinde, CKR, Hirsch, Monster, Siegel, and Safari)*

144.     Plaintiff specifically incorporates by reference paragraphs 1-136, *supra*.

145.     This count is against all Defendants.

146.     As set forth above, the Defendants agreed and conspired to violate 18 U.S.C. § 1962(c).

147.     The Defendants have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. The Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(c), in violation of 18 U.S.C. § 1962(d). As direct and proximate result of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in their business and property.

## COUNT III

### *Breach of the Term Loan Agreement*
### *(Against Rinde, CKR, Hirsch, Monster, Siegel, and Safari)*

148.     Plaintiff specifically incorporates by reference paragraphs 1-54, 113-29, *supra*.

149.     Defendants committed breach of contract by failing to perform under the Term Loan Agreement.

150.     Plaintiff performed fully in accordance with the Term Loan Agreement.

151.     Plaintiff has, or will incur, additional, special, and consequential damages in relation to Defendants' failure to perform under the Term Loan Agreement.

152.     Defendants failed to provide the consideration for which Plaintiff paid; specifically, Defendants failed to provide the loan which was the subject of the Term Loan Agreement.

153.     Plaintiffs are entitled to all direct and consequential damages resulting from the breach of the Term Loan Agreement, including the $480,000 advance fee.

154.     In addition, Plaintiff is entitled to judgment against Defendants for compensatory money damages, inclusive of interest, investigation expenses, expert fees, and other fees related to Defendants' failure to disburse the loan, including punitive damages, attorney fees, and all other costs incurred in this litigation.

155.     As a direct and proximate result of the foregoing breach of the Term Loan Agreement, and the Defendants' actions and/or omissions, Plaintiff has sustained general, special, consequential and incidental damages in an amount presently unknown, in that Plaintiff has incurred business losses as a result of Defendants' conduct.  Plaintiff will establish the precise amount of damages at trial, according to proof.

### **COUNT IV**
### *Breach of the Escrow Agreement*
### *(Against Rinde and CKR)*

156.    Plaintiff specifically incorporates by reference paragraphs 1-21, 26-54, 113-29, *supra.*

157.    Rinde and CKR committed breach of contract by failing to perform under the Escrow Agreement.

158.    Plaintiff performed fully in accordance with the Escrow Agreement.

159.    Plaintiff has, or will incur, additional, special, and consequential damages in relation to Rinde and CKR's failure to perform under the Escrow Agreement.

160.    Rinde and CKR failed to provide the consideration for which Plaintiff paid; specifically, Rinde and CKR failed to secure Plaintiff's escrow funds and disburse Plaintiff's escrow funds after the loan failed to materialize.

161.    Plaintiff is entitled to all direct and consequential damages resulting from the breach of the Escrow Agreement, including the $480,000 advance fee.

162.    In addition, Plaintiff is entitled to judgment against Rinde and CKR for compensatory money damages, inclusive of interest, investigation expenses, expert fees, and other fees related to Rinde and CKR's failure to secure and disburse Plaintiff's escrow funds after the loan failed to materialize, including punitive damages, attorney fees, and all other costs incurred in this litigation.

163.    As a direct and proximate result of the foregoing breach of the Escrow Agreement, and Rinde and CKR's actions and/or omissions, Plaintiff has sustained general, special, consequential and incidental damages in an amount presently unknown, in that Plaintiff has incurred business losses as a result of Rinde and CKR's conduct.  Plaintiff will establish the precise amount of damages at trial, according to proof.

## COUNT V

### Breach of the MOU and Monster Guarantee
### (Against Hirsch and Monster)

164.    Plaintiff specifically incorporates by reference paragraphs 1-19, 22-23, 26-54, 113-29, *supra.*

165.    Hirsch and Monster committed breach of contract by failing to perform under the MOU and Monster Guarantee.

166.    Plaintiff performed fully in accordance with the MOU and Monster Guarantee.

167.    Plaintiff has, or will incur, additional, special, and consequential damages in relation to Hirsch and Monster's failure to perform under the MOU and Monster Guarantee.

168.    Hirsch and Monster failed to provide the consideration for which Plaintiff paid; specifically, Hirsch and Monster failed to secure the loan or the reimburse the funds which were the subject of the MOU and Monster Guarantee.

169.    Plaintiff is entitled to all direct and consequential damages resulting from the breach of the MOU and Monster Guarantee, including the $480,000 advance fee.

170.    In addition, Plaintiff is entitled to judgment against Hirsch and Monster for compensatory money damages, inclusive of interest, investigation expenses, expert fees, and other fees related to Hirsch and Monster's failure to secure the loan or the reimburse funds, including punitive damages, attorney fees, and all other costs incurred in this litigation.

171.    As a direct and proximate result of the foregoing breach of the MOU and Monster Guarantee, and Hirsch and Monster's actions and/or omissions, Plaintiff has sustained general, special, consequential and incidental damages in an amount presently unknown, in that Plaintiff has incurred business losses as a result of Hirsch and Monster's conduct.  Plaintiff will establish the precise amount of damages at trial, according to proof.

## COUNT VI

### *Breach of the Safari/CKR Guarantee*
### *(Against Rinde, CKR, Siegel, and Safari)*

172.    Plaintiff specifically incorporates by reference paragraphs 1-21, 24-54, 113-29, *supra*.

173.    Rinde, CKR, Siegel, and Safari committed breach of contract by failing to perform under the Safari/CKR Guarantee.

174.    Plaintiff performed fully in accordance with the Safari/CKR Guarantee.

175.    Plaintiff has, or will incur, additional, special, and consequential damages in relation to Rinde, CKR, Siegel, and Safari's failure to perform under the Safari/CKR Guarantee.

176.    Rinde, CKR, Siegel, and Safari failed to provide the consideration for which Plaintiff paid; specifically, Rinde, CKR, Siegel, and Safari failed reimburse the funds which were the subject of the Safari/CKR Guarantee.

177.    Plaintiff is entitled to all direct and consequential damages resulting from the breach of the Safari/CKR Guarantee, including the $480,000 advance fee.

178.    In addition, Plaintiff is entitled to judgment against Rinde, CKR, Siegel, and Safari for compensatory money damages, inclusive of interest, investigation expenses, expert fees, and other fees related to Rinde, CKR, Siegel, and Safari's failure to reimburse funds, including punitive damages, attorney fees, and all other costs incurred in this litigation.

179.    As a direct and proximate result of the foregoing breach of the Safari/CKR Guarantee, and Rinde, CKR, Siegel, and Safari's actions and/or omissions, Plaintiff has sustained general, special, consequential and incidental damages in an amount presently unknown, in that Plaintiff has incurred business losses as a result of Rinde, CKR, Siegel, and Safari's conduct. Plaintiff will establish the precise amount of damages at trial, according to proof.

## COUNT VII

### *Fraudulent Inducement*

### *(Against Rinde, CKR, Hirsch, Monster, Siegel, and Safari)*

180.    Plaintiff specifically incorporates by reference paragraphs 1-54, 113-29, *supra*.

181.    In negotiating the Term Loan Agreement, Hirsch/Monster and Siegel/Safari represented to Plaintiff that they had successfully completed numerous similar loans.

182.    In negotiating the Term Loan Agreement, Hirsch/Monster and Siegel/Safari represented to Plaintiff that the counterparty funding the loan was an international corporation.

183.    In negotiating the Term Loan Agreement, Hirsch/Monster and Siegel/Safari represented to Plaintiff that Rinde/CKR had never failed to secure the loan funds on any previous loan agreement.

184.    In negotiating the Term Loan Agreement, Hirsch/Monster, Siegel/Safari, and Rinde/CKR guaranteed that return of the escrow funds would occur if the loan transaction failed.

185.    All of these statements were patently false.  Upon information and belief, the Defendants have never successfully funded a loan.

186.    The representations made by Hirsch/Monster, Siegel/Safari, and Rinde/CKR were patently false at the time they were made.

187.    The false representations made by Hirsch/Monster, Siegel/Safari, and Rinde/CKR to Plaintiff were material to the Term Loan Agreement.

188.    The false representations made by Hirsch/Monster, Siegel/Safari, and Rinde/CKR had knowledge of the falsity of the representations at the time they made them.

189.    The false representations made by Hirsch/Monster, Siegel/Safari, and Rinde/CKR made these false material representations with the intent to induce Plaintiff into the Term Loan Agreement.

190.    Plaintiff justifiably relied on these statements.

191.    Plaintiff suffered actual damages in an amount to be proven at trial, but not less than $480,000.

192.    As a direct and proximate result of the foregoing fraud, and the Defendants' actions and/or omissions, Plaintiff has sustained general, special, consequential and incidental damages, plus punitive damages and attorney fees in an amount presently unknown. Plaintiff will establish the precise amount of damages at trial, according to proof.

193.    Defendants' actions were gross, wanton, willful, and morally culpable.

194.    Defendants' conduct toward Plaintiff is only one example of a scheme that is nationwide in scope and has caused millions in losses to numerous parties.

195.    Plaintiff is entitled to punitive damages in an amount to be determined at trial.

<u>**COUNT VIII**</u>

*Conspiracy*

*(Against Rinde, CKR, Hirsch, Monster, Siegel, and Safari)*

196.    Plaintiff specifically incorporates by reference paragraphs 1-136, *supra*.

197.    Plaintiff has properly pleaded the cognizable tort of fraud as set forth above.

198.    The Defendants acted in concert and agreement with the purpose of defrauding Plaintiff.

199.    Each of the Defendants took overt action as set forth above.

200.    As such, all Defendants are jointly and severally liable for all damages resulting from the underlying tort, as set forth above.

<u>**COUNT IX**</u>

*Unjust Enrichment*

*(Against Rinde, CKR, Hirsch, Monster, Siegel, and Safari)*

201.    Plaintiff specifically incorporates by reference paragraphs 1-54, 113-29, *supra*.

202.    As a result of the conduct described above, the Defendants have been unjustly enriched in an amount to be proven at trial, to the detriment of Plaintiff.

## COUNT X

### *Conversion*
### *(Against Rinde, CKR, Hirsch, Monster, Siegel, and Safari)*

203.    Plaintiff specifically incorporates by reference paragraphs 1-54, 113-29, *supra*.

204.    In perpetrating the scheme set forth above, Defendants, with intent to deprive Plaintiff of $480,000, did in fact interfere with and exercise dominion over the funds, including refusal to return the funds, in derogation of Plaintiff's ownership rights.

## COUNT XI

### *Breach of Fiduciary Duty*
### *(Against Rinde and CKR)*

205.    Plaintiff specifically incorporates by reference paragraphs 1-21, 26-54, 113-29, *supra*.

206.    In perpetrating the scheme as set forth above, Rinde and CKR purported to act as an escrow agent for the subject transaction.

207.    It is well-settled that an escrow agent owes the parties to a transaction a fiduciary duty.

208.    Rinde and CKR failed to abide their fiduciary duty to Plaintiff, in that they failed to secure Plaintiff's funds, disbursed Plaintiff's funds from escrow without the authority to do so, and failed to disburse Plaintiff's funds back to Plaintiff after the subject transaction failed to materialize.

209.    Rinde and CKR had actual knowledge of the fraudulent nature of the transaction, that no prior transaction had been successful, but failed to make such disclosures to Plaintiff and released the escrow funds in violation of the fiduciary duties they owed Plaintiff as escrow agent.

210.    Upon information and belief, Rinde and CKR benefitted from releasing the escrow without the conditions being satisfied and acted in bad faith.

WHEREFORE, Gem City seeks judgment as follows:

   a.  Against Defendants, jointly and severally, awarding Plaintiff actual damages in an amount not less than $480,000, plus pre and post judgment interest;

   b.  Treble damages as permitted by statute, not less than $1,460,000;

   c.  Special, consequential and incidental damages to be established at trial;

   d.  Attorneys' fees and costs incurred in bringing this action pursuant to statute;

   e.  Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
          December 14, 2021

                              **NEWMAN FERRARA LLP**

                              By:   *s/ Jeffrey M. Norton*
                                     Jeffrey M. Norton
                                     Benjamin D. Baker
                              1250 Broadway, 27th Floor
                              New York, NY 10001
                              (212) 619-5400
                              jnorton@nfllp.com
                              bbaker@nfllp.com

                              ***Attorneys for Plaintiff***