## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

GEM CITY MANAGEMENT INC.,

                Plaintiff,

  -against-

JEFFREY RINDE, CKR LAW LLP,
DONALD HIRSCH, MONSTER CAPITAL
CORP., SAFARI TRADING LLC, and RICK
SIEGEL,

             Defendants.

No.: 21-CV-07676 (RA)

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE
## CKR DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS

**NEWMAN FERRARA LLP**
Jeffrey M. Norton
Benjamin D. Baker
1250 Broadway, 27th Floor
New York, NY 10001
jnorton@nfllp.com
bbaker@nfllp.com

*Attorneys for Plaintiff*
*Gem City Management Inc.*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................................................................... ii

I.     PRELIMINARY STATEMENT .................................................................................... 1

II.    STATEMENT OF RELEVANT FACTS ........................................................................ 3

       Background and the Defendants' Loan Scheme ........................................................ 3

       The Preliminary Pre-Closing Agreements ................................................................ 3

       Closing the Transaction and the Term Loan Agreement ........................................... 6

       The Defendants' Fraudulent Scheme Emerges ......................................................... 8

       Similar Misconduct and Gem City's Injury ............................................................ 10

III.   ARGUMENT .............................................................................................................. 11

       A.  There is No Basis to Compel Arbitration ....................................................... 11

       B.  This Action Should Not Be Stayed ................................................................ 19

IV.    CONCLUSION ........................................................................................................... 21

# TABLE OF AUTHORITIES

**CASES**                                                                                                  **PAGE(S)**

*Aguas Lenders Recovery Grp. L.L.C. v. Suez, S.A.*,
    585 F.3d 696 (2d Cir. 2009) ................................................................. 14-15

*Applied Energetics, Inc. v. Newoak Capital Mkts., L.L.C.*,
    645 F.3d 522 (2d Cir. 2011) ............................................................ 11-12, 13

*B&O Mfg. v. Home Depot U.S.A., Inc.*,
    2007 WL 3232276 (N.D. Cal. Nov. 1, 2007) ........................................... 19

*Bensadoun v. Jobe-Riat*,
    316 F.3d 171 (2d Cir. 2003) .................................................................... 14

*Buffet Crampon S.A.S. v. Schreiber & Keilwerth* ,
    2009 WL 3675807 (N.D. Ind. Nov. 2, 2009) ........................................... 19

*Butto v. Collecto Inc.*,
    802 F. Supp. 2d 443 (E.D.N.Y. 2011) ..................................................... 12

*CMS Inv. Holdings, L.L.C. v. Castle*,
    2016 WL 4557115 (S.D.N.Y. Aug. 31, 2016) ......................................... 12

*First Options of Chi., Inc. v. Kaplan*,
    514 U.S. 938 (1995) ............................................................................... 18

*Freedom Mortg. Corp. v. Irwin Fin. Corp.*,
    2009 WL 763899 (D. Del. Mar. 23, 2009) .............................................. 19

*Glencore Ltd. v. Degussa Engineered Carbons L.P.*,
    848 F. Supp. 2d 410 (S.D.N.Y. 2012) ..................................................... 11

*Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.* ,
    764 F.3d 210 (2d Cir. 2014) .................................................................... 13

*Golightly v. Uber Techs., Inc.*,
    2021 WL 3539146 (S.D.N.Y. Aug. 11, 2021) ......................................... 12

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
    561 U.S. 287 (2010) ............................................................................... 12

*Hard Rock Cafe Int'l, Inc. v. Hard Rock Hotel Holdings, L.L.C.*,
    808 F. Supp. 2d 552 (S.D.N.Y. 2011) ..................................................... 21

*Harrington v. Atl. Sounding Co.*,
    602 F.3d 113 (2d Cir. 2010) .................................................................... 12

*Hines v. Overstock.com, Inc.*,
    380 F. App'x 22 (2d Cir. 2010) ...................................................... 11, 12, 13

*Legacy Agency, Inc. v. Genske*,
   2020 WL 377705 (S.D.N.Y. Jan. 22, 2020) ........................................ 21

*Lesser v. TIAA Bank, F.S.B.*,
   2020 WL 2570352 (S.D.N.Y. May 21, 2020) ...................................... 21

*Lippus v. Dahlgren Mfg. Co.*,
   644 F. Supp. 1473 (E.D.N.Y. 1986) ........................................... 19-20

*Magi XXI, Inc. v. Stato della Città del Vaticano*,
   714 F.3d 714 (2d Cir. 2013) ..................................................... 16

*Matter of Belzberg v. Verus Invs. Holdings Inc.*,
   21 N.Y.3d 626 (2013) ........................................................... 18

*McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co.*,
   858 F.2d 825 (2d Cir. 1988) ..................................................... 11

*Mendez v. Puerto Rican Int'l Cos., Inc.*,
   553 F.3d 709 (3d Cir. 2009) ..................................................... 20

*Metro-Goldwyn-Mayer Studios Inc. v. Canal+ Distrib. S.A.S.*,
   2010 WL 537583 (S.D.N.Y. Feb. 5, 2010) ........................................ 15

*Nederlandse Erts-Tankersmaatschappij, N.v. v. Isbrandtsen Co.*,
   339 F.2d 440 (2d Cir. 1964) ..................................................... 20

*NLRB v. Newark Elec. Corp.*,
   2021 U.S. App. LEXIS 27988 (2d Cir. Sept. 17, 2021) ........................... 13

*Schnabel v. Trilegiant Corp.*,
   697 F.3d 110 (2d Cir. 2012) ..................................................... 12

*Specht v. Netscape Commc'ns Corp.*,
   306 F.3d 17 (2d Cir. 2002) ...................................................... 12

*Tapco Underwriters, Inc. v. Catalina London, LTD.*,
   2014 WL 7228711 (S.D.N.Y. Dec. 5, 2014) ....................................... 14

*TNS Holdings Inc. v. MKI Sec. Corp.*,
   92 N.Y.2d 335 (1998) ........................................................... 18

*Universal Grading Serv. v. eBay, Inc.*,
   2009 WL 2029796 (E.D.N.Y. June 9, 2009) ....................................... 16

## STATUTES

9 U.S.C. § 1 ....................................................................... 11

9 U.S.C. § 3 .................................................................... 19, 20

Plaintiff Gem City Management Inc. ("Gem City" or "Plaintiff") respectfully submits this Memorandum of Law in Opposition to the motion to compel arbitration and/or dismiss the Amended Complaint filed by Defendants Jeffrey Rinde ("Rinde") and CKR LLP (collectively, the "CKR Defendants") (Dkt. No. 36) (the "CKR Motion").[1] For the reasons set forth herein, the CKR Motion should be denied.[2]

## I.    PRELIMINARY STATEMENT

This action arises from a repeated and ongoing scheme perpetrated by the CKR Defendants, Donald Hirsch ("Hirsch"), Monster Capital Corp. ("Monster"), and Safari Trading LLC ("Safari," and collectively with all other defendants, the "Defendants") against victims in a variety of states, whereby Defendants conspired to, and executed, a plan to defraud victims out of hundreds of thousands of dollars, with an aggregate loss to the victims of millions of dollars, through the requirement of advance fees to participate in a fraudulent loan scheme. Using a scheme employing a variety of complicated corporate entities that Defendants represented were legitimate, Defendants conspired to defraud Gem City, and others, out of hundreds of thousands of dollars in "advance fees" under the ruse of obtaining millions of dollars in non-existent loans.

In short, Defendants' scheme was to offer prospective loan recipients "loans" in the millions of dollars so long as the loan recipients first put up hundreds of thousands of dollars to secure the loan, which, ultimately was never disbursed, and the advance fees  were never returned. Here, Gem City, as the prospective loan recipient, was offered $12 million in loans but was first

---

[1]   To the extent terms are not defined herein, all defined terms shall have the same meaning ascribed thereto in the Amended Complaint (Dkt. No. 35). All citations to paragraphs in the Amended Complaint are cited as" "Am. Compl. at ¶___."
[2]   The Defendants' individual motions are referred to specifically herein by citing to the defined defendant group that filed the motion, followed by the word "Motion," and the referenced page (*e.g.*, "CKR Mot. at __").

required to deposit an advance fee of $480,000 to be placed in escrow to "secure" said loan. Although the precise structure of the Defendants' scheme is well-concealed because of its intentional complexity, Defendants represented to Gem City that they had negotiated a secured term loan for $12 million, and that Gem City would begin to receive funds after tendering the advance fee. While Gem City fulfilled its obligation to fund the $480,000, the millions in promised loan proceeds were never delivered and the $480,000 was never returned to Gem City. As a result of the Defendants' actions, Gem City has been harmed financially and seeks to recover its damages.

All parties to this action are bound by a clear and unambiguous forum selection clause that provides for the ***exclusive*** and mandatory jurisdiction of this Court. Nevertheless, setting aside the fact that *all* of the instruments at issue in this case were procured through fraud for the purpose of carrying out a fraudulent loan scheme, the CKR Defendants now ask this Court to ignore every agreement an representation but one: an early escrow instrument containing a narrow and generic arbitration provision that was superseded by other agreements, including the primary term loan agreement containing a broad and explicit forum selection clause.

In fact, as all Defendants concede, this action is about an alleged fraudulent loan scheme by the Defendants; it is not an escrow dispute about an escrow agent misappropriating funds from escrow in an otherwise legitimate transaction, because in this case there was no purpose for the escrow funds other than offering a source of funds for the Defendants to steal. (Monster Mot. at 1; Safari Mot. at 1) ("Plaintiff's Amended Complaint details an alleged fraudulent loan scheme carried out by Defendants."); (CKR Mot. at 1) ("In the Amended Complaint, Plaintiff alleges a scheme to defraud Plaintiff of an 'advance fee' in connection with a commercial loan."). As set forth in further detail *infra*, the later Term Loan Agreement (*i.e.*, agreement related to the loan

transaction) clearly controls in this action, over the earlier Escrow Agreement (*i.e.*, agreement related solely to the CKR Defendants' retention as Escrow Agent).

For the above reasons, and the arguments made herein, the CKR Motion should be denied.

## II.   STATEMENT OF RELEVANT FACTS

### Background and the Defendants' Loan Scheme

In late 2019, Gem City was seeking financing to develop a legal marijuana cultivation facility, and for other corporate uses. (Am. Compl. ¶ 26). The cannabis industry is an emerging industry rife with complex regulatory and legal issues; traditional lenders, such as banks, rarely provide financing for such operations. (Am. Compl. ¶ 27). In September or October 2019, after being introduced by broker Bill Stroud of Nationwide Cannabis Funding LLC, Gem City had a call with Hirsch (Monster's principal), who pitched a loan program to Plaintiff. (Am. Compl. ¶ 28). In October 2019, Hirsch and Monster (together, the "Monster Defendants") provided an initial proposal to provide approximately $12 million in financing to Gem City. (Am. Compl. ¶ 29). The Monster Defendants also introduced Gem City to its business partner, Rick Siegel (Safari's principal), and together they assured Gem City that they had successfully closed numerous other loans similar to the loan being negotiated, using an international corporation as a counterparty. (Am. Compl. ¶ 30).

### The Preliminary Pre-Closing Agreements

On November 14, 2019, Monster and Gem City executed an MOU regarding the proposed financing. The MOU provided that, upon completion of certain conditions precedent, Gem City would receive its initial advance of $1.2 million and a total loan for $12 million. (Am. Compl. ¶ 31; Norton Decl. Ex. A). Upon the express direction of the Monster Defendants and Safari, the CKR Defendants were retained to act as Escrow Agent for the transaction. (Am. Compl. ¶ 32). On

November 12, 2019, the parties executed an Escrow Agreement which provided, *inter alia*, that Rinde, as Escrow Agent, would hold Gem City's deposit of $480,000 in CKR's attorney trust account – funds that would be returned to Gem City in the even the loan proceeds were not secured and delivered to Gem City through Monster, Safari, and CKR. (Am. Compl. ¶ 33; Norton Decl. Ex. B).

As relevant to the CKR Motion, the MOU contains a Governing Law provision specifying that "all matters relating to or arising out of the Proposed Transactions and the other transactions contemplated hereby and the rights of the parties (sounding in contract, tort, or otherwise) will be governed by and construed and interpreted under the laws of New York…." (Am. Compl. ¶ 13; Norton Decl. Ex. B § 9(c)). The Escrow Agreement also contains a Governing Law provision that specifies New York law as controlling and includes a forum selection clause that provides for the adjudication of disputes "arising from th[e] Escrow Agreement … by binding arbitration in City, County and State of New York." (Am. Compl. ¶ 14; Norton Decl. Ex. B § 16). However, the Escrow Agreement's arbitration provision lacks any specifics regarding delegation of authority, responsibility for costs, or the type of arbitration required. (Am. Compl. ¶ 14; Norton Decl. Ex. B).

Through emails and numerous telephonic discussions, Rinde repeatedly assured Gem City that its escrowed funds were "secure." (Am. Compl. ¶ 34). Under the Escrow Agreement, no funds could be released unless and until all of the following conditions were satisfied: (i) the CKR Defendants' receipt of the SWIFT MT760 with "Answer Back" from the Monster Defendants' designated investor bank, confirming the issuance and successful transmission of funds available to the Monster Defendants; and (ii) the CKR Defendants' receipt of the Monster Defendants' contractual commitment from an investor to fund the full loan amount. (Am. Compl. ¶ 35; Norton

Decl. Ex. B § 4). Nevertheless, despite the fact that neither of the conditions set forth in the Escrow Agreement were met, sometime between December 2019 and August 2020, the CKR Defendants appear to have released the entirety of Gem City's escrowed funds, converting the same for either Defendants' own use or to some presently-unknown third-party. (Am. Compl. ¶ 36).

Growing increasingly concerned with the legitimacy of the loan arrangement, on or about November 25, 2019, during a call with the Hirsch and Safari's principal, Rick Siegel ("Siegel"), Gem City sought, and received, a written guarantee from Safari and the CKR Defendants (the "Safari/CKR Guarantee") that if the loan transaction failed (and for some reason the deposited escrow funds could not be returned immediately), Safari would direct the CKR Defendants to release $480,000 of some $10 million of Safari's funds that the CKR Defendants were apparently holding. The Safari/CKR Guarantee was signed by Safari and the CKR Defendants. (Am. Compl. ¶ 37; Norton Decl. Ex. C).

The Safari/CKR Guarantee is notable because: (i) it evidences a subsequent and superseding contractual commitment to repay Gem City their advance fee outside the confines of the Escrow Agreement; (ii) it evidences a side agreement between co-conspirators the CKR Defendants and Safari regarding Gem City's funds; and (iii) it serves as a concession as to the illegitimacy of the Escrow Agreement which, if carried out as legally required, would not need a guarantee to safeguard Gem City's funds. (Am. Compl. ¶ 38). The only condition precedent required by Gem City for it to receive the first $1.2 million payment, was for it to tender a $480,000 advance fee to be held in escrow by the CKR Defendants, which it did on December 12, 2019. (Am. Compl. ¶ 39).

The same day, Hirsch – who was in regular contact with Rinde – confirmed via text message that Gem City's $480,000 "deposit" was received. (Am. Compl. ¶ 40). The advance fee

wire from Plaintiff, took place from Ohio, and was sent to a New York account. (Am. Compl. ¶ 57). Furthermore, the telephone calls and mailings in furtherance of the scheme have been made to and from Ohio, Illinois, Florida and New York. (Am. Compl. ¶ 57).

Then, on December 19, 2019, the Monster Defendants executed an agreement (the "Monster Guarantee"), which guaranteed that if Gem City did not receive the initial loan payment within 100 days of depositing its escrow funds with the CKR Defendants, the Monster Defendants would take all necessary action to ensure the release of Plaintiff's funds from escrow, and terminate the Term Loan Agreement. (Am. Compl. ¶ 41; Norton Decl. Ex. D). Much like the Safari/CKR Guarantee, the Monster Guarantee is notable because it confirms both: (i) the Monster Defendants' control over Gem City's funds; and (ii) the collective control of those funds by and among the Defendants as co-conspirators. (Am. Compl. ¶ 42). The Monster Guarantee clarifies that Gem City has no obligation to first demand the return of its funds if the loan payments do not materialize within 100 days. (Am. Compl. ¶ 43; Norton Decl. Ex. D).

### Closing the Transaction and the Term Loan Agreement

The financing and loan transaction purportedly closed on December 19, 2019, and was memorialized in the Term Loan Agreement, Note, Pledge and Security Agreement, all dated December 19, 2019. (Am. Compl. ¶ 44; Norton Decl. Exs. E–G). Section 9.2 of the Term Loan Agreement expressly states that all disputes in connection with the purported loan transaction involving Plaintiff and the Defendants **must be** adjudicated in a federal court in New York, and governed by New York law:

> All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the New York State or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. Each party hereby irrevocably submits to the ***exclusive jurisdiction of the federal courts***

> *sitting in New York, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein*, and to the extent permitted by applicable law, hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. To the extent permitted by applicable law, each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTIONS CONTEMPLATED HEREBY.

(Norton Decl. Ex. E § 9.2).

The Term Loan Agreement also contains an "entire agreement" provision that unambiguously provides for all provisions contained therein to control regarding all aspects of the transaction involving Gem City and all Defendants (necessarily inclusive of the prior Escrow Agreement):

> This Agreement and the other Transaction Documents supersede all other prior oral or written agreements between the Investor, Borrower, their Affiliates and Persons acting on their behalf with respect to the matters discussed herein and therein, and this Agreement, the other Transaction Documents and the instruments referenced herein and therein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Borrower nor the Investor makes any representation, warranty, covenant or undertaking with respect to such matters.

(Norton Decl. Ex. E § 9.6).

As defined in the Term Loan Agreement, "Person" refers to "an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, [or] any other entity." (Norton Decl. Ex. E at 18). As both the CKR Defendants and Safari acted on behalf of Plaintiff and the Monster Defendants in connection with matters

- 7 -

discussed in the Term Loan Agreement and other Transaction Documents (*e.g.*, the Term Loan Agreement, Escrow Agreement, MOU, Safari/CKR Guarantee, and Monster Guarantee), all Defendants are bound by the mandatory "exclusive" forum selection and choice of law provisions in the Term Loan Agreement.[3] (Am. Compl. ¶¶ 13-18).

### *The Defendants' Fraudulent Scheme Emerges*

After the Term Loan Agreement was executed, and Gem City did not receive its agreed-upon funds, Safari's principal, Siegel, suggested contacting Rinde through the messaging app WhatsApp. (Am. Compl. ¶ 46). The execution of the Term Loan Agreement also changed the Defendants' roles in the scheme – while Gem City was still in frequent communication with the Monster Defendants and Safari, the CKR Defendants took on the primary role of finding an investor and securing funds to back Gem City's loan (evidencing that the CKR Defendants' role in the scheme was far more involved than that of an escrow agent). (Am. Compl. ¶ 47). In connection with this role, Rinde suggested that he was reaching out to potential lenders to secure the funds for Gem City's loan and would disclose further information about the identity of a potential lender after Gem City agreed to a non-disclosure agreement. (Norton Decl. Ex. H).

In March 2020, after first falsely confirming in a text message that he had received the loan funds to disburse to Gem City, Rinde conceded that, in fact, he had not yet received any funding for the loan – specifically telling Gem City that the funds had not "hit[ the] law firm's account" as of March 23, 2020. (Am. Compl. ¶ 48; Norton Decl. Ex. H). Then, April 2020, Rinde once again falsely informed Gem City that he had received the funds for the loan and sent what he described

---

[3]   "Transaction Documents" include the "[Term Loan] Agreement, the Note, the Pledge and Security Agreement, and each of the other agreements, documents and certificates entered into by the parties hereto in connection with the transactions contemplated by this Agreement." (Norton Decl. Ex. E §§ 1.1, 6.2).

as "proof of the transfer," a fraudulent document which showed a purported transfer of $49.5 million Euros from The Commercial Bank of Qatar to the CKR Defendants from February 26, 2020 – the same time period when Rinde had previously informed Gem City that funds from an investor had neither been secured nor received. (Am. Compl. ¶ 49; Norton Decl. Ex. I).

On or about April 2, 2020 – more than 100 days after Gem City tendered its advance fee – the promised loan funds were still not disbursed, and Plaintiff requested proof of its $480,000 in guaranteed funds in accordance with its rights under the above agreements. (Am. Compl. ¶ 50; Norton Decl. Ex. H). Even after the Monster Defendants assured Gem City that they had discussed with Rinde and executed the non-disclosure agreement he had requested, Rinde still offered nothing in response to Gem City's request for proof of the guaranteed funds under the Monster Guarantee, despite stating: "I have it but I need [Hirsch] to sign the NDA first." (Norton Decl. Ex. H). On April 24, 2020, Rinde ignored that Gem City had again demanded proof of its funds from the CKR Defendants and the Monster Defendants, but offered a response regarding the Monster Guarantee from which Gem City was able to infer that its funds had been misappropriated. (Norton Decl. Ex. J) ("Please send me clear instructions pursuant to the letter dated November 25, 2019, to authorize CKR Law to direct the appropriate parties to release $480,000 for the benefit of Gem City Management as a refund of the escrow funds."). Even after Gem City clarified that it wanted "proof of the $480,000," and only demanded a return of its funds if the loan proceeds were not disbursed in 30-60 days, neither the CKR Defendants nor the Monster Defendants offered any response. (Norton Decl. Ex. K).

Indeed, Rinde provided no proof of the funds, and would not return Gem City's funds, but instead continually fed excuses to Gem City as to why the loan funds could not be delivered on time in accordance with the various loan agreements. For instance, in or around March 2020, Rinde

claimed that the funding was held up by the COVID-19 pandemic. Then, on or about March 17, 2020, Rinde told Gem City that the funds were "held up" in London. Similarly, on or about April 15, 2020, Rinde told Gem City that the "Feds" had seized the funds. On or about August 3, 2020, Rinde claimed that the funds were held up due the actions of certain unnamed persons "in the middle east." And, on or about January 27, 2020, February 8, 2020, and May 29, 2020, Rinde claimed that he was unavailable to release the funds because he was "stuck in China" or "stuck in Cambodia" due to the Covid-19 pandemic. (Am. Compl. ¶ 51; Norton Decl. Ex. H). All of these excuses, of course, were lies which were known to have been false when made, and Rinde's repeated assertions that he would secure and deliver the loan proceeds to Gem City and that the escrow funds held by the CKR Defendants were safe (or otherwise guaranteed by the CKR Defendants and the Safari Defendants without regard to the Escrow Agreement) were unmistakably false. (Am. Compl. ¶¶ 52-53).

### Similar Misconduct and Gem City's Injury

Besides the alleged acts of racketeering activity that Defendants committed in connection with the loan transaction involving Gem City, since at least 2014 the Defendants also engaged in similar prior misconduct, which generally involved directing their victims to engage in interstate and international wire transfers between Arizona, Florida, Illinois, Michigan, Minnesota, New York, Pennsylvania, Tennessee, Canada, Hong Kong, and likely elsewhere. (Am. Compl. ¶¶ 60, 62-112). Further, given that the last presently-known victims were defrauded in 2019 and the Defendants are upon information and belief continuing to advertise the loan program, there is a substantial threat of continuing criminal conduct. (Am. Compl. ¶ 61).

Because of Defendants' scheme to steal nearly half a million dollars from Gem City through their established enterprise-in-fact, Gem City never received the promised loan proceeds

or even a return of its $480,000 advance fee. (Am. Compl. ¶¶ 54, 56). Gem City was further injured by lost business as a result of the fraud, devoting substantial time and resources to finding a loan that ended up not existing, and incurring additional and significant expenses associated with securing financing to replace the loan proceeds, and the loss of business as a result of less operating capital than anticipated. (Am. Compl. ¶ 130).

## III.   ARGUMENT

### A.  There Is No Basis to Compel Arbitration

Under the Second Circuit's application of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, this Court retains discretion to determine whether an agreement to arbitrate is even at issue, and then, if some but not all claims are arbitrable, whether to stay the entirety of the proceedings pending arbitration. *See McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co*., 858 F.2d 825, 830 (2d Cir. 1987) ("First, [the court] must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration."). To invoke the mandates of the FAA, Defendants "must make a *prima facie* initial showing that an agreement to arbitrate existed before the burden shifts to the party opposing arbitration to put the making of that agreement 'in issue.'" *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010).

Therefore, the "presumption of arbitrability does not apply where (as here) the issue is the threshold one of whether the[re is] … a binding agreement to arbitrate at all." *Glencore Ltd. v. Degussa Engineered Carbons L.P.*, 848 F. Supp. 2d 410, 421 (S.D.N.Y. 2012); *Applied Energetics, Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011) ("Here, because

the parties dispute … whether an obligation to arbitrate exists, the presumption in favor of arbitration does not apply"); *see also Granite Rock of Chicago v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 303 (2010). "Consistent with these principles, the party seeking to compel arbitration has the burden of demonstrating by a preponderance of the evidence the existence of an agreement to arbitrate." *Butto v. Collecto Inc.*, 802 F. Supp. 2d 443, 446 (E.D.N.Y. 2011). Thereafter, the party "seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010).

When deciding whether a valid agreement exists such that arbitration should be compelled, "the Court applies the standard on a motion to compel arbitration that it applies on a motion for summary judgment," which "requires courts to consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with ... affidavits." *Golightly v. Uber Techs., Inc.*, 2021 WL 3539146, at *2 (S.D.N.Y. Aug. 11, 2021) (internal quotations and alterations omitted); *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (citing *Bensadoun v. Jobe Riat*, 316 F.3d 171, 175 (2d Cir. 2003)); *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012) ("Allegations related to the question of whether the parties formed a valid arbitration agreement … are evaluated to determine whether they raise a genuine issue of material fact that must be resolved by a fact-finder at trial."). "It is well settled that a court may not compel arbitration until it has resolved 'the question of the very existence' of the contract embodying the arbitration clause." *Specht v. Netscape Commc'ns Corp.,* 306 F.3d 17, 26 (2d Cir. 2002).

To consider the validity of an arbitration agreement, "courts should generally apply state-law principles that govern the formation of contracts." *CMS Inv. Holdings, LLC v. Castle*, 2016 WL 4557115, at *6 (S.D.N.Y. Aug. 31, 2016) (quoting *Applied Energetics*, 645 F.3d at 526).

"Under New York law, it is well established that a subsequent contract regarding the same matter will supersede the prior contract." *Applied Energetics*, 645 F.3d at 526. And, finally, when the moving party fails to "make a *prima facie* initial showing that an agreement to arbitrate existed," a motion to compel arbitration must be denied. *Hines v. Overstock.com, Inc*., 380 F. App'x 22, 24 (2d Cir. 2010).

Here, the Term Loan Agreement was executed on December 19, 2019, 35 days after the execution of the Escrow Agreement (*i.e.*, November 14, 2019). The Term Loan Agreement contains a forum selection clause that provides for "exclusive jurisdiction of the federal courts sitting in New York, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein," while the arbitration clause in the Escrow Agreement provides that "any differences or dispute … arising from this Agreement … shall be referred to and finally settled by binding arbitration in City, County and State of New York." (*Compare* Norton Decl. Ex. B § 9(c) *with* Norton Decl. Ex. E § 9.2). Clearly, as long as the Term Loan Agreement applies to this dispute and is binding upon the CKR Defendants, then the forum selection clause contained therein encompasses, irreconcilably conflicts with, and supersedes the arbitration provision in the Escrow Agreement. *See NLRB v. Newark Elec. Corp.*, 2021 U.S. App. LEXIS 27988, at *25-26 (2d Cir. Sep. 17, 2021) ("Under New York's common-law doctrine of contract merger, when parties who have entered first into one agreement subsequently enter into a second regarding the same subject matter, the first agreement 'merges' with the second, and the terms of the second agreement control"). "[A]n agreement to arbitrate is superseded by a later-executed agreement containing a forum selection clause if the clause specifically precludes arbitration." *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 764 F.3d 210, 215 (2d Cir. 2014). "[T]here is no requirement that the forum selection clause mention

arbitration in order to supersede an arbitration clause." *TAPCO Underwriters, Inc. v. Catalina London Ltd.*, 2014 WL 7228711, at *3 (S.D.N.Y. Dec. 8, 2014).

      In what serves as an implicit acknowledgment that the forum selection clause in the Term Loan Agreement supersedes the arbitration provision in the Escrow Agreement, the CKR Defendants argue that because they did not sign the Term Loan Agreement, they "did not waive their right to arbitration of claims arising from the Escrow Agreement." (CKR Mot. at 3). Notwithstanding, for <u>six</u> reasons there are issues of fact that prevent CKR Defendants from satisfying their burden of establishing by a preponderance of the evidence that a valid agreement to arbitrate exists. *See Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) ("If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary.").

      First, the "entire agreement" provision in the Term Loan Agreement explicitly states that it "supersede[s] all other prior oral or written ***agreements between the Investor, Borrower, their Affiliates and Persons acting on their behalf*** with respect to the matters discussed herein and therein…." (Norton Decl. Ex. E § 9.6). The CKR Defendants unquestionably acted on behalf of Gem City and the Monster Defendants by serving as Escrow Agent. Moreover, the CKR Defendants acted on behalf of the Monster Defendants and the Safari Defendants by communicating with Gem City about the status of its loan after the Term Loan Agreement was executed, and on behalf of all parties according to Rinde's representations that he was responsible for locating an investor and securing funds to back Gem City's loan. (Am. Compl. ¶¶ 46, 53; Norton Decl. Ex. H). Therefore, the fact that the CKR Defendants are non-signatories to the Term Loan Agreement cannot preclude enforcement of the controlling forum selection clause contained therein. *See Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 701 (2d Cir. 2009) (concluding, after surveying case law from various courts, that "the fact a party is a non-signatory

to an agreement is insufficient, standing alone, to preclude enforcement of a forum selection clause").

Second, based on the CKR Defendants' prior and ongoing relationship with the Monster Defendants and Safari – in a representative capacity, as business partners, debtors/creditors, the recipient of the Term Loan Agreement "for informational purposes," and as co-conspirators – there can be little (if any) question that the CKR Defendants are closely related to the other Defendants, and knew about the forum selection clause in the Term Loan Agreement and foresaw that suits related to the Defendants' scheme would be filed in the "exclusive jurisdiction of the federal courts sitting in New York." (Am. Compl. ¶¶ 13-18, 37-40, 46-53). In fact, as the only New York residents in this action, the CKR Defendants almost certainly drafted the provisions that are at the center of this motion, with the intention of litigating disputes close to home, without local counsel, in disputes governed by well-understood New York law. Indeed, the choice of law provisions in the Escrow Agreement, MOU, Safari/CKR Guarantee, Pledge and Security Agreement, Senior Secured Promissory Note, and Term Loan Agreement all explicitly provide that the agreements and any disputes are to be governed by New York law. (Am. Compl. ¶¶ 13-15; Norton Decl. Exs. A-C, E-G).

"Under New York law, a signatory to a contract may invoke a forum selection clause against a non-signatory if the non-signatory is 'closely related' to one of the signatories such that 'enforcement of the forum selection clause is foreseeable by virtue of the relationship between the signatory and the party sought to be bound.'" *Metro–Goldwyn–Mayer Studios Inc. v. Canal Distributions S.A.S*, 2010 WL 537583, at *5 (S.D.N.Y. Feb. 9, 2010) (quoting *Direct Mail Prod. Servs. Ltd. v. MBNA Corp.*, 2000 WL 1277597, at *3 (S.D.N.Y. 2000)). "In such instances, the relationship between the non-signatory and that (latter) signatory must be sufficiently close that

the non-signatory's enforcement of the forum selection clause is 'foreseeable' to the signatory against whom the non-signatory wishes to enforce the forum selection clause." *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013). "The same standard applies to the determination whether non-signatory defendants are bound by a forum selections clause as applies to non-signatory plaintiffs." *Universal Grading Serv. v eBay, Inc.*, 2009 WL 2029796, at *16 (E.D.N.Y. June 10, 2009). Based on the close relationship between the Defendants, and in consideration of the CKR Defendants' knowledge and foreseeability of the forum selection clause in the Term Loan Agreement, the CKR Defendants' non-signatory status should not prevent them from being bound by the superseding forum selection clause contained therein.

Third, the forum selection clause in the Term Loan Agreement controls because, as alleged in the Amended Complaint, the arbitration clause in the Escrow Agreement is limited to the adjudication of disputes "arising from th[e Escrow] Agreement…." (Am. Compl. ¶ 14; Norton Decl. Ex. B § 16). Further, because the Term Loan Agreement contains a merger clause, explicitly states that it supersedes all other prior agreements related to the loan transaction between Gem City and the Defendants, and provides for the mandatory and exclusive adjudication of disputes in New York federal courts. (Am. Compl. ¶¶ 16–18; Norton Decl. Ex. E). By contrast, the Escrow Agreement contains no merger clause, limits the application of its arbitration clause to disputes arising thereunder, makes no mention of the loan transaction or any of the other agreements that the parties executed in connection therewith, and applies only to the CKR Defendants' appointment as Escrow Agent for Gem City and the Monster Defendants "to hold in escrow, and to administer the disposition of the Escrow Funds in accordance with the terms of th[e] Agreement…." (Am. Compl. ¶¶ 32-36; Norton Decl. Ex. B).

However, as explicitly alleged in the Amended Complaint, the CKR Defendants' misconduct was not limited to acting as an Escrow Agent. (Am. Compl. ¶¶ 32-54). Rather, this action "arises from a repeated and ongoing scheme perpetrated by Defendants against victims in a variety of states, whereby Defendants conspired to, and executed, a plan to defraud victims out of hundreds of thousands of dollars, with an aggregate loss to the victims of millions of dollars, through the requirement of advance fees to participate in a fraudulent loan scheme." (Am. Compl. ¶ 1). In fact, in addition to the $480,000 (of misappropriated escrow funds) sought in actual damages through this action, Gem City also seeks "[s]pecial, consequential and incidental damages" related to lost business as a result of the fraud, devoting substantial time and resources to finding a loan that ended up not existing, and incurring additional and significant expenses associated with securing financing to replace the loan proceeds, and the loss of business as a result of less operating capital than anticipated. (Am. Compl. ¶ 130). Accordingly, there is no agreement to arbitrate this dispute in the Escrow Agreement, nor is there any remaining agreement to arbitrate any dispute whatsoever – *i.e.*, the mandatory forum selection clause in the Term Loan Agreement superseded and terminated all remaining situations where the Escrow Agreement's arbitration clause might otherwise control.

Fourth, as signatories to the Term Loan Agreement, the Monster Defendants cannot be compelled to arbitrate claims that they specifically negotiated must be adjudicated exclusively in either this Court, or the other New York federal courts. While the Monster Defendants now claim in their motion this dispute belongs in arbitration, that argument squarely contradicts black letter New York State contract law, which requires those who have negotiated and agreed to contractual obligations (including forum selection clauses) to abide by those commitments. (Monster Mot. at 12-16). Therefore, as a matter of New York law, to be forced to arbitrate a claim, a party must

actually have agreed to arbitrate that claim. *See TNS Holdings, Inc. v. MKI Sec. Corp.*, 92 N.Y.2d 335, 339 (1998) ("Although arbitration is favored as a matter of public policy, equally important is the policy that seeks to avoid the unintentional waiver of the benefits and safeguards which a court of law may provide in resolving disputes. Indeed, unless the parties have subscribed to an arbitration agreement it would be unfair to infer such a significant waiver on the basis of anything less than a clear indication of intent.") (internal citations omitted). However, because the Monster Defendants have agreed to a forum selection clause in the Term Loan Agreement that provides for the exclusive adjudication of disputes in this Court, they cannot be forced now to violate that provision by adjudicating the same through arbitration.

Fifth, because Safari  is a non-signatory to the Escrow Agreement, the CKR Defendants cannot compel Safari to adjudicate this action through arbitration. That is because in the arbitration context, the Supreme Court and New York Court of Appeals have held that a defendant who has not signed the agreement containing the arbitration clause has not agreed to submit the arbitrability of the dispute to arbitration. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so.") (quoting *AT&T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 649 (1986)); *see also Matter of Belzberg v. Verus Invs. Holdings Inc.*, 21 N.Y.3d 626, 630 (2013) ("[a]rbitration is a matter of contract, … [so] a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.").

Finally, if the Court determines that the CKR Defendants have satisfied their burden and established by a preponderance of the evidence that the arbitration clause in the Escrow Agreement remains valid and controlling in connection with Gem City's claims (they most certainly have not and cannot do so), it remains virtually undeniable that Plaintiff's claims against the Monster

Defendants and Safari would continue to be litigated before this Court. To state the obvious, such a result would be inefficient, frustrate judicial economy, and could lead to inconsistent rulings in proceedings that would otherwise involve identical parties, claims, allegations, issues, and controlling law. To avoid this situation, federal courts considering conflicting forum selection clauses related to separate claims raised in a single action often decline to enforce both clauses out of concern for wasting judicial and party resources. *See*, *e.g.*, *Bufet Crampon S.A.S. v. Schreiber & Keilwerth, Musikinstrumente GMBH*, 2009 WL 3675807, at *8 (N.D. Ind. Nov. 2, 2009); *Freedom Mortgage Corp. v. Irwin Fin. Corp.*, 2009 WL 763899, at *4–5 (D. Del. March 23, 2009). In so ruling, these courts have concluded enforcement of both clauses is unreasonable under the circumstances, owing to the inefficiency that arises from splitting the action into multiple proceedings. *See B & O Mfg., Inc. v. Home Depot U.S.A., Inc.*, 2007 WL 3232276, at *3 (N.D. Cal. Nov. 1, 2007). Instead, in such a situation the courts undertake fact-intensive analyses to determine which forum selection clause should be enforced. *See Freedom Mortgage Corp.*, 2009 WL 763899, at *4–5 (declining to enforce one clause where defendant previously filed an action in the forum provided in the second clause). Accordingly, should the Court determine that both the arbitration clause from the Escrow Agreement and the forum selection clause from the Term Loan Agreement constitute presumptively valid and enforceable (albeit conflicting) agreements, the CKR Defendants would necessarily be prevented from establishing the validity and enforceability of the arbitration clause to this action, warranting the Court's denial of the CKR Motion.

### B.  This Action Should Not Be Stayed

 "Although this Court must stay the adjudication of arbitrable claims pending arbitration, 9 U.S.C. § 3, this is not the case with non-arbitrable claims." *Lippus v. Dahlgren Mfg. Co.*, 644 F.

Supp. 1473, 1483 (E.D.N.Y. 1986). Here, even if this Court were to compel Gem City to arbitrate its claims related to the Escrow Agreement, the remainder of Plaintiff's claims should proceed. In fact, there is no question that Safari is not bound by the Escrow Agreement's arbitration clause or that claims against all Defendants arising out of the Monster Guarantee, the Safari/CKR Guarantee, and the Term Loan Agreement fall outside the scope of the Escrow Agreement's arbitration provision. Accordingly, there is no basis for Defendants to seek a stay under 9 U.S.C. § 3. *See Mendez v. Puerto Rican Int'l Companies, Inc.*, 553 F.3d 709, 715 (3d Cir. 2009) ("for a party to be the subject of a mandatory stay pending arbitration under Section 3 of the FAA, that party must have committed itself to arbitrate one or more issues in suit").

The CKR Defendants argue that "Plaintiff's RICO and conspiracy claims necessarily involve issues concerning the CKR Defendants that are referable to arbitration under the arbitration provision of the Escrow Agreement," and because those issues also involve the other defendants, the action should be stayed pending. (CKR Mot. at 6). However, that the Plaintiff's claims involve multiple Defendants is no basis for the Court to grant a stay, and absent the CKR Defendants establishing that a stay is warranted, their request should be denied. *See Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.*, 339 F.2d 440, 442 (2d Cir. 1964) ("The defendants have the burden of establishing that a stay is warranted. Without attempting to list all relevant factors, we point out that the defendants should demonstrate to the satisfaction of the court that they have not taken nor will take any steps to hamper the progress of the arbitration proceeding, that the arbitration may be expected to conclude within a reasonable time, and that such delay as may occur will not work undue hardship.").

Again, it is undisputed that the Term Loan Agreement, Monster Guarantee, and Safari/CKR Guarantee do not contain arbitration clauses, and that Plaintiff's claims related to the

same have nothing to do with the construction of the Escrow Agreement. Based on this alone, the CKR Motion for a stay should be denied because "the Court cannot conclude that there exist common issues that will be finally determined by arbitration." *Legacy Agency, Inc. v. Genske*, 2020 WL 377705, at *2 (S.D.N.Y. Jan. 23, 2020). And, even if this case were found to involve some common issues between potentially arbitrable claims and those that are certainly nonarbitrable, the CKR Defendants would need to satisfy their burden of demonstrating: (i) that a stay will not hamper the progress of the proceeding; (ii) that the arbitration is expected to conclude within a reasonable time; and (iii) that the stay will not impose an undue hardship on the non-moving party. *See Hard Rock Cafe Int'l, (USA), Inc. v. Hard Rock Hotel Holdings, LLC*, 808 F. Supp. 2d 552, 564 (S.D.N.Y. 2011). However, the CKR Defendants cannot plausibly satisfy this burden because any stay would necessarily hamper the progress of the instant proceeding and unreasonably delay the resolution of claims that must be litigated in this Court under the Term Loan Agreement. *See Lesser v. TIAA Bank, FSB*, 2020 WL 2570352, at *7 (S.D.N.Y. May 21, 2020) (denying motion to stay pending arbitration when only "a *portion* of the claims … are subject to arbitration," because "no matter the outcome of the arbitration, the Court will have to decide myriad … claims."). Accordingly, the Court should also deny the CKR Motion as it pertains to staying this action.

## IV.    CONCLUSION

For all the foregoing reasons, Plaintiff respectfully submits that the Court should enter an Order denying the CKR Motion in its entirety, or, in the alternative, granting Gem City leave to amend, and for such other and further relief as the Court deems just and proper.

Dated: March 17, 2022

Respectfully submitted,

**NEWMAN FERRARA LLP**

*/s/ Jeffrey M. Norton*
Jeffrey M. Norton
Benjamin D. Baker
1250 Broadway, 27th Floor
New York, NY 10001
jnorton@nfllp.com
bbaker@nfllp.com

*Attorneys for Plaintiff*
*Gem City Management Inc.*